STATE OF CONNECTICUT *v.* CHARLES SLIMSKEY
(SC 16411)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued April 25—officially released September 4, 2001

*Donald G. Leis, Jr.*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, was *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Charles Slimskey, was convicted[1] after a jury trial of two counts of risk of injury

---

[1] The defendant had been charged in a six count amended information with: (1) risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21 for having permitted the victim on diverse dates between 1991 and April, 1995, to view a sexually explicit videotape; (2) risk of injury to a child in violation of § 53-21 for having engaged in fellatio with the victim on or about January, 1995; (3) sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), for having engaged in fellatio with the victim on or about January, 1995; (4) risk of injury to a child in violation of § 53-21 for having engaged in fellatio with the victim on or about March, 1995; (5) sexual assault in the second degree in violation of § 53a-71(a) (1) for having engaged in fellatio with the victim on or about March, 1995; and

to a child in violation of General Statutes (Rev. to 1995) § 53-21, one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), and one count of possession of fireworks in violation of General Statutes (Rev. to 1995) § 29-357 (a).[2] The defendant appealed from the judgment of conviction to the Appellate Court, claiming that the trial court had abused its discretion by denying him access to certain school records, including any psychological and psychiatric records, of the victim, a teenaged boy. The Appellate Court affirmed the judgment of conviction. *State* v. *Slimskey*, 59 Conn. App. 341, 757 A.2d 621 (2000). We granted the defendant's petition for certification to appeal, limited to the following issue: "Whether the Appellate Court properly affirmed the trial court's refusal to permit the defendant to have access to certain school records of the teenaged complaining witness?" *State* v. *Slimskey*, 254 Conn. 938, 761 A.2d 764 (2000). We conclude that certain portions of the records should

(6) possession of fireworks in violation of General Statutes (Rev. to 1995) § 29-357. He was convicted on the first, second, third and sixth counts.

[2] General Statutes (Rev. to 1995) § 53-21 provides: "Injury or risk of injury to, or impairing morals of, children. Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

General Statutes § 53a-71 provides in relevant part: "Sexual assault in the second degree: Class C felony: Nine months not suspendable. (a) A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ."

General Statutes (Rev. to 1995) § 29-357 provides in relevant part: "Sale, use and possession of fireworks prohibited. Regulations concerning permits for display. Variations or exemptions. Penalty. (a) Except as provided in subsection (b) of this section, no person, firm or corporation shall offer for sale, expose for sale, sell at retail or use or explode or possess with intent to sell, use or explode any fireworks. . . ."

have been disclosed to the defendant. Accordingly, we reverse in part the judgment of the Appellate Court.

The record contains the following facts and procedural history. Prior to trial, the defendant had filed a motion seeking disclosure of certain of the victim's school records, including psychological and psychiatric records that may have been contained therein. In that motion, the defendant sought to have the court conduct an in camera inspection of the records to determine whether anything contained therein would bear on the credibility of the victim or his ability to testify truthfully.

The trial court, *Scheinblum, J.,* after granting the pretrial motion and conducting an in camera inspection, determined that there was nothing in the records that would bear on the ability of the victim to testify truthfully. Accordingly, the court denied the defendant access to and use of the records. The case proceeded to trial and at the end of the defendant's case, he moved that the trial court, *Cutsumpas, J.,* conduct an in camera review of the school records to determine if they contained information that would bear on the truthfulness of the victim's testimony. The trial court denied the motion on the ground that another court at an earlier stage in the same proceedings had reviewed the records and had denied the defendant access to them.[3]

---

[3] As quoted in the Appellate Court, in denying the defendant's motion Judge Cutsumpas stated: " 'Well, counsel, from what I understand from the in-chambers conference and from a review of the court file, the clerk's file, your motion for an examination of these in camera records was vigorously pursued. I read this morning the twelve page brief, which your office had filed for that purpose. And Judge Scheinblum, from my examination of the file, apparently granted your motion for an in camera review and reviewed those records. And according to the transcript you handed to me, Judge Scheinblum said, and I quote: "And I made an in camera inspection, and I find nothing in there that would bear upon the witness' ability to be truthful. His ability to recant the allegations and, accordingly, it will go no further." And so your in camera review was granted, counsel.

\* \* \*

"I am also concerned that the state would be somewhat prejudiced at this stage if I overturned Judge Scheinblum's order even if I had authority

In deciding whether the trial court improperly had denied the defendant access to the victim's school records, including any psychological or psychiatric records that may have been contained within such records, the Appellate Court inspected the records based upon its obligation " 'to determine if the trial court abused its discretion in refusing to release those records to the defendant.' " *State* v. *Slimskey*, supra, 59 Conn. App. 345–46. Concluding that the trial court reasonably could have found that they contained no evidence that was probative of the victim's ability to be truthful, the Appellate Court determined that the trial court had not abused its discretion in denying the defendant's motion for disclosure of the victim's school and psychiatric records. Id., 346.[4] Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 350. We disagree.

We have reviewed the records in connection with this appeal and conclude that the defendant should have been given access to portions of the records, and that the failure to afford him access at trial was not harmless. Accordingly, we reverse in part the judgment of the Appellate Court.

I

The following evidence adduced at trial is pertinent to the issue before this court. The victim, a male child between the ages of fourteen and fifteen at the time of

to do so on the basis that they prepared their case without the benefit of these records. . . . I suspect that the state had the same kind of concerns. So, counsel, I am going to deny your request. If you wish to put the witness on with something new, I would be happy to entertain it. If not, I am denying your request.' " *State* v. *Slimskey*, supra, 59 Conn. App. 345 n.2.

[4] In his appeal to the Appellate Court, the defendant additionally claimed that Judge Cutsumpas had abused his discretion in failing to review the records in light of the evidence introduced at trial. The Appellate Court reviewed the records and determined that the defendant had suffered no prejudice resulting from the court's refusal to review them a second time. *State* v. *Slimskey*, supra, 59 Conn. App. 346 n.3.

the alleged occurrences involved herein, lived with his father, his father's girlfriend and a younger brother in New Britain. According to his father's testimony at trial, the victim loved motor vehicles, built model cars, read books about cars, helped his father work on cars, visited race tracks and talked constantly about cars. Additionally, the victim loved motorcycles and raced his own motorcycles in various events in the amateur class. According to his father, the victim first met the defendant in the summer of 1993, when he stopped at the defendant's automobile repair and restoration business, called Valley Enterprises, located in New Britain. He and the defendant began to spend time together, sharing what the victim's father believed was a love of cars.

In 1995, the victim stole his father's truck, which he drove to another location in New Britain, where he stole another vehicle and thereafter drove to Delaware. Following the receipt of a telephone call from the police in Wilmington, Delaware, the victim's father retrieved the victim and thereafter imposed certain restrictions on his freedom. As a further consequence of the victim's behavior, his father started recording his telephone conversations. After hearing conversations between the defendant and the victim containing abbreviations that he thought were spoken in some sort of code, the victim's father approached the victim in an effort to learn what the victim and the defendant had been saying to one another. Thereafter, during a counseling session with a psychologist that the victim and his father had started seeing sometime in late 1994 or early 1995, the victim's father first learned that the victim had been having sexual relations with the defendant. He also learned that the defendant had exhibited bizarre behavior involving the victim's hair and that, among other things, the defendant enjoyed giving the victim haircuts while engaging in sexual activity. The victim's father contacted an attorney, and thereafter brought the victim

to the Berlin police department, where the victim was interviewed by the police. Sometime thereafter, the victim, through his father, commenced a civil action against the defendant based on the alleged conduct of the defendant involved herein. Although the victim's father testified that he had no prior knowledge of the sexual activities in which his son and the defendant had engaged, he had been aware, even before allowing his son to go on an unchaperoned trip with the defendant to Vermont, that the defendant was a forty-three year old male who liked to cut his son's hair and whom the father believed was a pedophile.

The victim testified at trial that soon after he had met the defendant, he began visiting him at work several times a week. The victim's father traveled frequently due to business and the victim enjoyed watching the defendant work on the cars. The victim related how the defendant took him to his home, ostensibly to show him model cars, and that while there, the defendant persuaded him to view the "Dirty Dozen," a pornographic videotape, and to masturbate. The victim testified that initially, he did not consider that he was doing anything improper. He described other videotapes the defendant had that depicted bestiality and children having sex with other children, and noted the defendant's obsession with cutting hair. The victim identified a written contract, which he and the defendant had executed, that allowed the defendant to have full control over the victim's hair in exchange for a promise by the defendant to sell the victim, at cost, a Ford Mustang when he turned sixteen years of age.[5] According to the victim, they engaged in oral sex on several occasions, and frequently, the defendant gave the victim money and model cars in exchange for sex. On one occasion, the defen-

---

[5] The victim had told his father, the police and the trial court that despite the written contract requiring him to pay for the car, the defendant had actually promised to give it to him for free.

dant's greyhound dog was involved. Although each time the defendant invited him to his home the victim expected that they would engage in sexual activity, he, nevertheless, accompanied the defendant because he felt that the defendant controlled him.

Thomas Hodolitz, the police officer to whom the victim first reported the events leading to the defendant's arrest, described the victim as reluctant. Additionally, the victim's first statement to police on April 18, 1995, although long, was incomplete. Consequently, the victim returned to the police station two days later to provide additional information. On the same evening that the first statement was given, the Berlin police executed a warrant to search the defendant's home, resulting in the seizure of, among other things, a pornographic videotape entitled the "Dirty Dozen," thirteen other videotapes, including tapes depicting child pornography, an adult magazine, several locks of hair, a memo book, some haircutting tools, pliers, tweezers and a bag of fireworks.

Bruce Freedman, a clinical psychologist, testified for the state at trial in general terms about children who have been victimized sexually. According to Freedman, most are reluctant to disclose the abuse, and such reticence is particularly prevalent when the abuser is an adult of the same sex as the child. He concluded that the detail provided by the victim in his statements to the police was "consistent with a true report of the child's sexual abuse."

Largely through cross-examination of the victim, his father and Hodolitz, the defendant painted a picture of the victim as a troubled young man, whose problems began long before his involvement with the defendant. The victim's parents had separated when he was just one year old, and he lived with his mother for twelve years. For a period of six years, the victim and his father

had no contact. Shortly before the victim's involvement with the defendant, the victim allegedly had been physically abused by his mother's boyfriend, who lived with the victim and his mother. As a result of those allegations, an investigation by the state department of children and families was conducted and the victim's father sought a change in his son's custody. Unfortunately, the victim had significant troubles in school, which ultimately led his father to remove him from school and to "home school" him. At one point, the victim stole two vehicles in an effort to run away from home. When he was apprehended in Delaware, the victim told the police that he had fled because his father was forcing him to work for free, an explanation he later denied having given. Nevertheless, despite these problems and despite the allegations of the defendant's sexual abuse of the victim, the victim's father chose to discontinue his son's counseling shortly after they reported the alleged abuse to the police. Finally, it was disclosed that at the time of trial, the victim had burglary and criminal mischief charges pending against him in Meriden, and robbery, burglary and assault charges pending against him in Bantam.

The defendant testified that he began working at a garage when he was twelve years of age. He loved cars and was an avid collector of car models and memorabilia. During his testimony, he identified a variety of cutting implements that he used in connection with his work on car models. He also cut hair, a hobby he had enjoyed for thirty years. The defendant kept a book containing an extensive list of names of people for whom he regularly cut hair. He cut hair for men only and their ages ranged from thirteen to fifty. He also colored hair for people and explained that the hair samples seized by the police had come from people whose hair he had lightened.

The defendant related that the first time the victim came to his shop was in the summer of 1993. Thereafter, he came by sporadically, for a glass of water or to watch the mechanics work. In the late summer of 1993, the victim and a friend were chased off the defendant's property by a coworker because the boys had been rummaging through the cars parked there. The defendant did not see the victim again until June, 1994, when he started to come around occasionally, either riding his bicycle or driving a red Saab automobile or a white Ranger pickup truck. Because he had seen the victim driving these vehicles, the defendant assumed the victim was older than he actually was.

Thereafter, in September, 1994, the victim came to the defendant's house to get a haircut. In his testimony, the defendant denied that any sexual contact had occurred at that time. Rather, he claimed that he only had cut the victim's hair as requested. During the fall of 1994, the victim began to come to the defendant's shop more frequently, asking to help out. This pattern of behavior continued until the early part of 1995. The defendant testified that he found the victim to be an irritant. The defendant also explained that the contract about which the victim had testified was something instigated by the victim, who desperately wanted a Mustang, and that he had told the victim to "write what you want" in the contract.

The defendant testified that the victim seemed to be sexually knowledgeable, bragging that he had seen his girlfriend nude, and that the victim knew lyrics to a song entitled "Detachable Penis." The defendant related that in February, 1995, the victim came to his home for a haircut, and that while the defendant was out walking his dog, the victim began to watch a pornographic movie entitled the "Dirty Dozen," a movie loaned to the defendant by an elderly friend, whom he identified by name. The defendant testified that he never told the victim

about the movie; nor had he ever watched it with him. The defendant had borrowed a few such videotapes from his friend, along with some magazines, but never possessed any videotapes depicting bestiality or child pornography. The defendant explained some of the abbreviations the jury had heard on the tape-recorded telephone conversations between him and the victim, ascribing an innocent interpretation to each one. Finally, the defendant testified that the fireworks found by the police had been purchased by him for his twenty-nine year old niece, whom he also identified by name.

John H. Felber, a psychiatrist, testified for the defendant regarding typical behavior that is exhibited by an adult homosexual pedophile. According to Felber, such a person is a predator, who is eager to obtain many victims. Felber also testified that a person who has a hair fetish is fixated on hair and that hair is the object of that person's affections. He concluded that there was no correlation between pedophilia and fetishes, and opined that there was no correlation between pedophilia and bestiality. Finally, Felber testified that, based on his experience, three factors might induce a person to lie about having been sexually abused: money; vengeance; and a child custody dispute. George Higgins, a clinical psychologist, testified that in his private practice he had treated approximately 1000 homosexuals, some of whom were pedophiles. On the basis of his experience, Higgins opined that some teenagers make false allegations of sexual abuse for a variety of reasons. The most common reason for these false allegations relates to the family structure, and the occurrences are more prevalent in "dysfunctional families."

After his last witness, the defendant once again sought access to the victim's school records. As noted previously; see footnote 3 of this opinion; the trial court did not consider it necessary to revisit the pretrial ruling by Judge Scheinblum precluding disclosure of the

records and accordingly denied the defendant's request for disclosure.

Following the defendant's conviction of four of the six counts charged; see footnote 1 of this opinion; and pursuant to a motion for production made in connection with the civil action brought by the victim against the defendant alleging sexual abuse, the defendant sought and received access to the victim's school records, including a January, 1994 report from James C. Black, a psychiatrist, and a November, 1993 psychological evaluation by Cynthia Rutledge, the victim's school psychologist.[6] The defendant appealed from the judgment of conviction in his criminal action to the Appellate Court, which determined that the decision of Judge Cutsumpas denying the defendant access to the records was proper. *State* v. *Slimskey*, supra, 59 Conn. App. 346. This appeal followed.

II

A criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. *Delaware* v. *Fensterer*, 474 U.S. 15, 19, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985); *Davis* v. *Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Storlazzi*, 191 Conn. 453, 457, 464 A.2d 829 (1983). Thus, in some

[6] The motion seeking production of the victim's school records in the civil action, filed pursuant to General Statutes § 52-146f (5), was argued on May 11, 1998, following depositions of the victim and his father, at which the defendant learned that the victim had had disciplinary problems at school that required him to be seen by a psychologist and a psychiatrist. As part of its decision to provide these records to the defendant, the trial court, *Graham, J.*, restricted the defendant's use of the records to the civil proceeding and thereby barred him from using them as a basis upon which to seek a new trial in the criminal action.

instances, otherwise privileged records, like the ones in this case, must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. *State* v. *Hufford*, 205 Conn. 386, 401–402, 533 A.2d 866 (1987); *State* v. *Pierson*, 201 Conn. 211, 227, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 286 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989).

The defendant in the present case does not argue that his right to confrontation under the sixth amendment to the United States constitution was violated by the trial court's denial of access to the victim's school records merely because he was precluded from inquiring into the victim's troubled youth. He recognizes that the right to cross-examine witnesses "does not include the power to *require* the pretrial disclosure of any and all information that *might* be useful in contradicting unfavorable testimony." (Emphasis added.) *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 53, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). The defendant concedes that the confrontation clause guarantees " 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish' "; id., quoting *Delaware* v. *Fensterer*, supra, 474 U.S. 20. Therefore, the defendant acknowledges that he was not entitled to an unlimited inspection of the victim's school records in the hope of discovering material evidence. He claims, however, that he has a legitimate interest in access to records bearing on the testimonial reliability of the victim at or around the time of trial, or of the occurrence about which he is to testify, and that he was entitled to access to the victim's school records, in particular the reports compiled by Black and Rutledge. We agree.

The need to balance a witness' statutory privilege to keep psychiatric records confidential against a defendant's rights under the confrontation clause is well recognized. See, e.g., *State* v. *Herring,* 210 Conn. 78, 108–109, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).[7] The test and the associated burdens imposed on a defendant are equally well chronicled. "If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness. . . . If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera.[8] A witness' refusal to consent to such an in camera inspection entitles the defendant to have the witness' testimony stricken. . . .

"Upon inspecting the records in camera, the trial court must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. . . . If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the

<hr>

[7] As we stated in *State* v. *Herring,* supra, 210 Conn. 108, "[t]his court has previously undertaken the task of balancing a witness' psychiatric privilege against a defendant's right of confrontation. See *State* v. *Hufford,* [supra, 205 Conn. 400–405]; *State* v. *Pierson,* [supra, 201 Conn. 225–28]; *State* v. *Bruno,* 197 Conn. 326, 329–32, 497 A.2d 758 (1985), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986); *State* v. *Esposito,* 192 Conn. 166, 177–80, 471 A.2d 949 (1984); *State* v. *Storlazzi,* [supra, 191 Conn. 455–63]."

[8] In the present case, the defendant's confrontation rights were initially protected by the trial court's screening of the confidential records.

witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused." (Internal quotation marks omitted.) *State* v. *McMurray*, 217 Conn. 243, 257–58, 585 A.2d 677 (1991).[9]

"Access to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records." (Internal quotation marks omitted.) *State* v. *Harris*, 227 Conn. 751, 762, 631 A.2d 309 (1993). "[T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . *so as to justify*

---

[9] We reaffirm that the in camera approach represents the most effective and sensitive balance between the interests of the criminal defendant and private citizens who expect and rely on the confidentiality of their psychiatric records and communications. A criminal defendant does not have a right "to conduct a general fishing expedition" into a witness' privileged records. (Internal quotation marks omitted.) *State* v. *Januszewski*, 182 Conn. 142, 172, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). As we stated in *State* v. *Pratt*, 235 Conn. 595, 611, 669 A.2d 562 (1995), "in camera judicial review of a victim's privileged records currently represents the most common method of balancing statutory privileges against the defendant's trial rights. See, e.g., *Jordan* v. *State*, 607 So. 2d 333, 335 (Ala. Crim. App. 1992); *Gunter* v. *State*, 313 Ark. 504, 512–13, 857 S.W.2d 156 (1993); *People* v. *District Court*, 743 P.2d 432, 436 (Colo. 1987); *People* v. *Foggy*, 121 Ill. 2d 337, 349–50, 521 N.E.2d 86 (1988); *Goldsmith* v. *State*, 337 Md. 112, 133–35, 651 A.2d 866 (1995); *Commonwealth* v. *Bishop*, 416 Mass. 169, 179–80, 617 N.E.2d 990 (1993); *People* v. *Stanaway*, 446 Mich. 643, 678–79, 521 N.W.2d 557 (1994); *State* v. *Cressy*, 137 N.H. 402, 413, 628 A.2d 696 (1993); *State* v. *Kalakosky*, 121 Wash. 2d 525, 550, 852 P.2d 1064 (1993)."

breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Citation omitted; internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988).

The defendant claims that, in the course of this court's in camera inspection of the records, we will discover that they contained material evidence relating directly to the victim's ability to comprehend, know or correctly relate the truth. Therefore, he contends that we must conclude that the trial court failed to discharge its duty to disclose that evidence to him. See *State* v. *Storlazzi*, supra, 191 Conn. 461.

Our review of the victim's school records, viewed in conjunction with the entire trial transcript, convinces us that portions of the Black and Rutledge reports directly relate to his credibility and could have created a reasonable doubt of the defendant's guilt. Rutledge stated in her report that the victim "is prone to distort his perception of reality with paranoid and persecutorial ideas." Black's report contained a reference gathered from his meeting with Rutledge that the victim had "concocted a story about being victimized." When the victim was suspended for bringing a plastic cap gun and ammunition to school, he claimed that they belonged to another student and that he had been "framed," despite the fact that the evidence indicated that he was responsible. Black described numerous episodes of the victim acting out in sexually inappropriate ways and then fabricating stories to exonerate himself, including incidents in which he exposed himself to a particular female student, whom he had followed home and into whose home he had attempted, uninvited, to gain entry; exposed himself in class; urinated in the hallway at school; and followed girls to the bathroom. When questioned about the episode involving the female student he had fol-

lowed home, the victim falsely stated that it was another student who had carried out the actions.

By engaging in a review of the records, a specific procedure designed to accommodate the inherent tension between the defendant's rights of confrontation and the victim's right to confidentiality, we conclude that the trial court should have disclosed those portions of the records that we have referenced, and that its failure to do so constituted an abuse of discretion. Although the determination whether to disclose the records, in whole or in part, rests, in the first instance, within the trial court's discretion, our assessment of the trial court's decision to restrict the defendant's access to the witness' confidential records must, however, take into account the recognized principle that such a restriction "implicates the defendant's constitutional right to impeach and discredit state witnesses." (Internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 532, 673 A.2d 1117 (1996). Whether this type of impropriety warrants a new trial may depend on whether the defendant must demonstrate that it was more probable than not that the impropriety affected the result of the trial; *State* v. *Pinnock*, 220 Conn. 765, 786, 601 A.2d 521 (1992); or whether the state must demonstrate harmlessness beyond a reasonable doubt. *State* v. *Aponte*, 249 Conn. 735, 753, 738 A.2d 117 (1999).

Although the confrontation right is not absolute and is subject to reasonable limitation; *State* v. *Vitale*, 197 Conn. 396, 401, 497 A.2d 956 (1985); there is, nevertheless, a minimum level of cross-examination that must be afforded to the defendant into matters affecting the reliability and credibility of the state's witnesses. *State* v. *Milum*, 197 Conn. 602, 609, 500 A.2d 555 (1985). In the present case, the defendant was denied access to information compiled by trained professionals that was relevant to and probative of the victim's ability to comprehend, to know and to relate the truth. As a conse-

quence, the defendant had *no* opportunity to elicit evidence regarding the victim's predilection for concocting stories about being victimized or his tendencies "to distort his perception of reality with paranoid and persecutorial ideas." Having determined that the evidence in issue was especially probative and having concluded that there was no other available means of inquiry into the victim's propensity to lie, we necessarily have concluded that the confrontation clause requires the disclosure. Therefore, we resolve the burden of proof issue against the state, which, accordingly must prove that the trial court's decision denying the defendant access to portions of the reports was harmless beyond a reasonable doubt.[10]

"The correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . *State* v. *Santiago*, 224 Conn. 325, 333, 618 A.2d 32 (1992)." (Internal quotation marks omitted.) *State* v. *Aponte*, supra, 249 Conn. 753.

In this case, there was no physical evidence that both corroborated the victim's version and contradicted the defendant's account of the events. The search of the defendant's home resulted in the seizure of several haircutting implements, assorted pieces of human hair, a

---

[10] We note that the state correctly assumed this burden of proof in its brief.

few pornographic videotape cassettes and a Hustler magazine. Those items corroborated some aspects of the victim's testimony. They also corroborated, however, some aspects of the defendant's testimony, and no physical evidence corroborated the essential elements of the alleged sexual conduct. In short, the only determination necessary was whether the alleged sexual activity occurred. The answer to that question turned on the credibility of the victim. Certainly, if his testimony had been discredited altogether,[11] the jury properly could not have returned the same guilty verdicts. Cf. *State* v. *Gonzales*, 186 Conn. 426, 435, 441 A.2d 852 (1982). Therefore, on the present record, we cannot conclude that the trial court's decision denying the defendant access to the records was harmless beyond a reasonable doubt.

The judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to reverse the judgment of the trial court with respect to the defendant's convictions of sexual assault in the second degree and risk of injury to a child and to remand the case for a new trial on those counts.

In this opinion BORDEN and NORCOTT, Js., concurred.

VERTEFEUILLE, J., with whom SULLIVAN, C. J., joins, dissenting. I respectfully disagree with the majority's application to the facts in this case of our established test to determine whether a defendant should be granted access to the psychological and/or psychiatric records of a witness. Particularly, I disagree with the majority's conclusion that certain portions of reports

---

[11] The jury found the defendant guilty based upon its belief in the victim's testimony as it related to the pornographic videotape and the January, 1995 sexual conduct, but it rejected his testimony regarding the March, 1995 incident. See footnote 1 of this opinion. Although generally, we avoid reading too much into a jury's verdict, in this instance, as it relates to the issue of harm, it is hard to overlook.

compiled by James C. Black, a psychiatrist, and Cynthia Rutledge, the victim's school psychologist, relate directly to the victim's ability or capacity to comprehend, know and correctly relate the truth and therefore should have been disclosed to the defendant. Although I do agree that one comment from Rutledge's report does relate to the victim's ability to comprehend, know and correctly relate the truth, I conclude that the trial court's failure to allow the defendant access to that comment was harmless. Because I would affirm the Appellate Court's judgment affirming the trial court's judgment of conviction, I therefore must dissent.

In *State* v. *Storlazzi*, 191 Conn. 453, 459, 464 A.2d 829 (1983), this court stated that "[t]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material *especially probative of the ability to comprehend, know and correctly relate the truth* . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation. Access to records bearing on the *mental unsoundness* of a witness (i.e., *relating to a trait importing in itself a defective power of observation, recollection or communication*), at or around the time of trial or of the occurrence about which he is to testify . . . should be granted to the defendant." (Citations omitted; emphasis added; internal quotation marks omitted.)

I agree that the statement in Rutledge's report that the victim "is prone to distort his perception of reality with paranoid and persecutorial ideas," is "especially probative" of the victim's ability to comprehend, know and correctly relate the truth and should have been disclosed to the defendant. I disagree, however, with the majority when it reaches the same conclusion with regard to comments found in Black's report that disclose that: (1) the victim had "concocted a story about being victimized"; (2) the victim had lied that a gun and

ammunition, which he had brought into school and subsequently was suspended for, belonged to another student and that he had been framed; and (3) the victim had lied to exculpate himself from numerous incidents of sexually inappropriate behavior.

With regard to these comments, I conclude that the trial court properly withheld these portions of the records from the defendant because they are not especially probative of the victim's ability or capacity to comprehend, know and correctly relate the truth. See *State* v. *Howard*, 221 Conn. 447, 458, 604 A.2d 1294 (1992); *State* v. *McMurray*, 217 Conn. 243, 258–59, 585 A.2d 677 (1991). Rather, they describe incidents in the past when the victim had lied. I agree with the majority that these comments demonstrate that when the victim, a teenager, had put himself in a situation where he would be reprimanded or punished, he would lie to exonerate himself. Telling lies to exonerate oneself, however, is not an indication of an inability to comprehend, know and correctly relate the truth. Unfortunately, adolescents do sometimes tell lies in order to exonerate themselves.

None of these statements taken from the victim's confidential records bear on the victim's " 'mental unsoundness.' " See *State* v. *Storlazzi*, supra, 191 Conn. 459. They do not relate "to a trait importing in itself a defective power of observation, recollection or communication . . . ." (Internal quotation marks omitted.) Id. I therefore would conclude that, apart from the comment taken from Rutledge's report, the trial court properly denied the defendant access to the victim's psychiatric and psychological records.

I next consider whether the trial court's improper withholding of the single comment from Rutledge's report requires reversal of the defendant's convictions for risk of injury to a child and sexual assault in the

second degree. I agree with the majority that "the state . . . must prove that the trial court's decision denying the defendant access to portions of the reports was harmless beyond a reasonable doubt." "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 254, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

I recognize, as the majority points out and the state concedes, that the testimony of the victim concerning the alleged sexual assault was not directly corroborated by other testimony. I conclude, however, that the overall strength of the state's case and the extent of the cross-examination of the victim that was permitted by the trial court would have rendered the withholding of Rutledge's single statement harmless beyond a reasonable doubt.

In his statements to the police and during his testimony at trial, the victim, although initially hesitant, gave a detailed account of the alleged sexual abuse by the defendant. The victim also correctly described the defendant's home, including the defendant's bedroom area, demonstrating that he had spent a considerable amount of time there. The victim also demonstrated an accurate memory of the defendant's pornography

collection, including pornographic videotapes and magazines. In particular, the victim described videotapes depicting bestiality and children having sex with other children. He also identified the videotape entitled the "Dirty Dozen" and described the contents of the film. The victim also had intimate knowledge of the defendant's bizarre hair fetish and gave gruesome details about what the defendant had done with the victim's hair. The victim also described with particularity the tools the defendant had used to "pull" the victim's hair out.

Although there were no eyewitnesses to the alleged incidents of fellatio, to a large extent, the victim's testimony was corroborated on material points by other evidence. The police, on the basis of the victim's statement, had executed a warrant to search the defendant's home. They found, among other things, several pornographic videotapes, including child pornography videotapes and the "Dirty Dozen" videotape, pornographic magazines, one of which was found on a table in the defendant's living room, a bag nearly one-half filled with human hair, and haircutting tools. Furthermore, Bruce Freedman, a clinical psychologist, explained that the victim's reluctance to give the police a statement and the details concerning the sexual abuse ultimately provided by the victim in his statements to the police were consistent with children who have been abused sexually. The prosecution's case was strong.

Moreover, I am "convinced that nothing in the [psychiatric] records would have added weight to the defendant's thorough cross-examination of [the victim] . . . ." *State* v. *Howard*, supra, 221 Conn. 458; *State* v. *Crosswell*, 223 Conn. 243, 270, 612 A.2d 1174 (1992). On the basis of my review of the record, the defendant thoroughly cross-examined the victim, eliciting various inconsistencies between the statements the victim had given to the police and his testimony during the trial. The defendant also elicited testimony from the victim

that could have led the jury to believe that the victim's father had pushed the victim to fabricate this story against the defendant so that the victim's father could bring a civil action against the defendant. The victim's father eventually did bring a civil action against the defendant, which was pending at the time of the criminal trial, and the defendant elicited this information from the victim. The defendant's cross-examination also showed contradictions between the victim's testimony and certain other evidence, reflecting on his truthfulness and his memory of the alleged events. Finally, the defendant elicited from the victim testimony concerning various criminal charges that were pending against the victim in other towns, further depicting the victim as a very troubled teenager. I do not believe that Rutledge's statement that the victim was "prone to distort his perception of reality with paranoid and persecutorial ideas" would have influenced the judgment of the jury.

On the basis of the overall strength of the state's case and the leeway the trial court afforded the defendant during his cross-examination of the victim, I conclude that the trial court's decision denying the defendant access to Rutledge's single statement concerning the victim's propensity to "distort his perception of reality with paranoid and persecutorial ideas" was harmless. I would affirm the defendant's conviction and, therefore, I respectfully dissent