******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CARLOS P.*
(AC 39616)

Lavine, Alvord and Pellegrino, Js.

*Argued December 5, 2016—officially released March 14, 2017*

(Appeal from Superior Court, judicial district of
Danbury, Pavia, J.)

*Pamela S. Nagy*, assistant public defender, for the
appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with
whom, on the brief, were *Stephen J. Sedensky III*, state's
attorney, *Deborah Mabbett*, senior assistant state's
attorney, and *Edward L. Miller*, deputy assistant state's
attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Carlos P., appeals from the judgment of conviction, rendered after a trial to the jury, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of attempted sexual assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-70 (a) (2), risk of injury to a child in violation of General Statutes § 53-21 (a) (2), and one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A).[1] On appeal, the defendant claims that (1) his convictions of sexual assault in the first degree and attempt to commit sexual assault in the first degree violate the constitutional prohibition against double jeopardy, (2) his convictions of sexual assault in the first degree and sexual assault in the fourth degree violate the constitutional prohibition against double jeopardy, (3) the court erred by rejecting his *Batson*[2] challenge, and (4) the court abused its discretion by failing to disclose all of the psychiatric and medical records of the state's key witness. We reverse, in part, and affirm, in part, the judgment of the trial court.

The jury reasonably could have found the following facts. On November 21, 2012, the then three year old victim lived with her mother in an apartment in Danbury. The defendant is the victim's father, but he did not then live with the victim and mother. He was, however, a frequent visitor who occasionally spent the night in the apartment. The defendant and mother had a good relationship when the defendant was not abusing alcohol. He primarily spoke Spanish, and mother primarily spoke English, but the two devised a form of communication for themselves, a combination of English and Spanish.

On the day in question, the defendant appeared at the apartment after several days of drinking. He was intoxicated and asked mother for sex. Mother refused because she did not have sex with the defendant when he was drunk. That day, mother was busy preparing for the next day's Thanksgiving celebration and needed to go to the store to make a purchase. She stayed in the apartment for forty-five minutes to ensure that the defendant did not consume any additional alcohol and that he was sober enough to look after the victim. Before mother left the apartment, she gave the victim, who was in her own room, a popsicle. The defendant was sitting on the couch in the living room.

When mother returned to the apartment ten minutes later, she saw the victim, with her popsicle, reclining on the couch with her pants and underwear down around her ankle and her legs wide open. The defendant was sitting a pillow's length away from the victim in a corner of the couch with his pants unbuckled. Mother asked the defendant what was going on. The defendant

responded, in Spanish, that the mother did not care for him and "chupa chapa."[3] Mother slapped the defendant on the face and stated that she was going to call the police. Mother called 911 and went outside with the victim to open the door for the police.

When mother returned to the apartment, she saw the defendant in the bathroom and heard running water. She observed the defendant washing his penis and genital area. She stated to the defendant not to do that, but he buckled up his pants and left the apartment. According to mother, she had never before seen the defendant sponge bathing his penis; he showered like everyone else.

After the police arrived, the victim and mother were transported via ambulance to the emergency room, where Krystyna Isbell, a registered nurse and sexual assault nurse examiner, administered a standardized sexual assault evidence kit to the victim to collect evidence. Isbell found no signs of physical trauma to the victim and swabbed her external genitalia and vagina. The specimens collected from the victim were placed in sealed bags, transferred to a police officer, Michelle Cattuti, and delivered to the state forensic laboratory for analysis.

At the state forensic laboratory, Jane Codraro, a forensic biologist, examined the material collected from the victim's vagina and external genitalia. Codraro did not find any spermatozoa, which is the cellular component of semen, but she found evidence of p30, a seminal fluid protein. A positive result for p30 indicates, but does not conclusively establish, the presence of semen. Codraro used sophisticated DNA testing to determine that the DNA extracted from the genetic material taken from the victim's vagina came from the defendant or from the same paternal lineage.

Mother spoke to the defendant via telephone several weeks later when he called. Mother stated to the defendant that he was not to come to the apartment until he had spoken with the Danbury Police Department. The defendant voluntarily went to the Danbury Police Department on December 5, 2012, where he was interviewed by Detective Heather Burke. The defendant gave Burke an oral statement in Spanish.[4]

The defendant was arrested in January, 2013, and charged with sexual assault in the first degree in violation of § 53a-70 (a) (2), attempted sexual assault in the first degree in violation of §§ 53a-49 and 53a-70 (a) (2), risk of injury to a child in violation of § 53-21 (a) (2), risk of injury to a child in violation of § 53-21 (a) (1),[5] and sexual assault in the fourth degree in violation of § 53a-73 (a) (1). Additional facts will be set forth as needed.

I

DOUBLE JEOPARDY CLAIMS

The defendant has raised two double jeopardy claims on appeal: (1) his convictions for sexual assault in the first degree in violation of § 53a-70 (a) (2) and attempted sexual assault in the first degree in violation of §§ 53a-49 and 53a-70 (a) (2) violated the constitutional prohibition against double jeopardy, and (2) his convictions of sexual assault in the first degree in violation of § 53a-70 (a) (2) and sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A) also violated the constitutional prohibition against double jeopardy. We agree with the defendant's first but not his second double jeopardy claim.

The defendant failed to preserve his double jeopardy claims at trial and seeks to prevail on appeal pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under [*Golding*] a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Emphasis added; internal quotation marks omitted.) *State* v. *Fabricatore*, 281 Conn. 469, 476–77, 915 A.2d 872 (2007); see *In re Yasiel*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). The defendant's claims are reviewable because the record is adequate for review, and the claims are of constitutional magnitude.

Double jeopardy claims present a question of law over which our review is plenary. See *State* v. *Burnell*, 290 Conn. 634, 642, 966 A.2d 168 (2009). "The fifth amendment to the United States constitution provides in relevant part: No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Brown*, 299 Conn. 640, 650–51, 11 A.3d 663 (2011).

"Double jeopardy prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense. . . . The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . The defendant on appeal bears the burden of prov-

ing that the prosecutions are for the same offense in law and fact." (Internal quotation marks omitted.) *State* v. *Felder*, 146 Conn. App. 621, 625, 78 A.3d 224 (2013), cert. denied, 311 Conn. 909, 83 A.3d 1164 (2014). The double jeopardy prohibition also is violated if one crime is a lesser included offense of the other. See *State* v. *Morin*, 180 Conn. 599, 601–605, 430 A.2d 1297 (1980); *State* v. *Haywood*, 109 Conn. App. 460, 465–66, 952 A.2d 84, cert. denied, 289 Conn. 928, 958 A.2d 161 (2008).

"The traditional approach to analyzing whether two offenses constitute the same offense was set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Internal quotation marks omitted.) *State* v. *Greco*, 216 Conn. 282, 291, 579 A.2d 84 (1990). "This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial. . . . Thus, the issue, though essentially constitutional, becomes one of statutory construction." (Internal quotation marks omitted.) *State* v. *Felder*, supra, 146 Conn. App. 625–26, quoting *State* v. *Alvaro F.*, 291 Conn. 1, 7, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009). "The test used to determine whether one crime is a lesser offense included within another crime is whether it is not possible to commit the greater offense, in the manner described in the information . . . without having first committed the lesser . . . . This . . . test is satisfied if the lesser offense does not require any element which is not needed to commit the greater offense." (Internal quotation marks omitted.) *State* v. *Haywood*, supra, 109 Conn. App. 465. "Therefore, a lesser included offense of a greater offense exists if a finding of guilt of the greater offense necessarily involves a finding of guilt of the lesser offense." *State* v. *Arokium*, 143 Conn. App. 419, 435, 71 A.3d 569 (possession of narcotics lesser included offense of possession of narcotics with intent to sell), cert. denied, 310 Conn. 904, 75 A.3d 31 (2013).

When a defendant has been found guilty of both a greater and a lesser offense, the remedy is to vacate the defendant's conviction of the lesser included offense. *State* v. *Polanco*, 308 Conn. 242, 248, 61 A.3d 1084 (2013).

A

The defendant claims that his convictions of sexual assault in the first degree in violation of § 53a-70 (a) (2)[6] and attempted sexual assault in the first degree in violation of §§ 53a-49[7] and 53a-70 (a) (2) violated the constitutional prohibition against double jeopardy. The state acknowledges that the defendant's convictions of

both attempt to commit sexual assault in the first degree and sexual assault in the first degree arose from the same act, and therefore concedes that attempt to commit sexual assault in the first degree is a lesser included offense of sexual assault in the first degree. We agree.

The following procedural facts are relevant to our resolution of the defendant's claim. In its substitute long form information filed on May 20, 2014, the state charged in count one that "on or about November 21, 2012, at approximately 11:45 a.m. at an apartment building on Fifth Avenue in Danbury . . . [the defendant] engaged in sexual intercourse with another person and such other person was under thirteen years of age and the actor was more than two years older than such other person. To Wit: a three year old minor female, in violation of . . . § 53a-70 (a) (2)." In count two, the state charged that "on or about November 21, 2012, at approximately 11:45 a.m. at an apartment building on Fifth Avenue in Danbury . . . [the defendant] attempted to engage in sexual intercourse with another person and such other person was under thirteen years of age and the actor was more than two years older than such other person. To Wit: a three year old minor female, in violation of [§§] 53a-49 and 53a-70 (a) (2)."

Because one cannot commit the greater offense of sexual assault in the first degree without first attempting to commit sexual assault in the first degree, the defendant's conviction of attempt to commit sexual assault in the first degree and sexual assault in the first degree violates the prohibition against double jeopardy. The two offenses, therefore, are the same for purposes of double jeopardy. To rectify the constitutional violation, the defendant's conviction of attempt to commit sexual assault in the first degree, and resulting sentence, must be vacated. See *State* v. *Polanco*, supra, 308 Conn. 249.

B

The defendant's second claim is that his convictions of sexual assault in the first degree in violation of § 53a-70 (a) (2)[8] and sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A)[9] violated the constitutional prohibition against double jeopardy. We do not agree.

As previously stated, we apply the test set out in *Blockburger* v. *United States*, supra, 284 U.S. 304, "to determine whether two statutes criminalize the same offense . . . ." (Internal quotation marks omitted.) *State* v. *Alvaro F.*, supra, 291 Conn. 7. Pursuant to the *Blockburger* test, "the test to be applied to determine whether there are two offense or only one, is whether each provision requires proof of a fact which the other does not. . . . This test is a technical one and examines the statutes, charging instrument, and bill of particulars as opposed to the evidence presented at trial. . . .

Thus, [t]he issue, though essentially constitutional, becomes *one of statutory construction.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id.

"The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent. . . . Thus, the *Blockburger* test creates only a rebuttable presumption of legislative intent, [and] the test is not controlling when a contrary intent is manifest. . . . When the conclusion reached under *Blockburger* is that the two crimes do not constitute the same offense, the burden remains on the defendant to demonstrate a clear legislative intent to the contrary." (Citation omitted; internal quotation marks omitted.) *State* v. *Wright*, 319 Conn. 684, 690, 127 A.3d 147 (2015).

"In applying the *Blockburger* test, we are permitted to examine only the charging documents and the relevant statutory provisions. . . . We are prohibited from examining the evidence presented at trial. Indeed, [i]n making this determination, we are concerned with theoretical possibilities, and do not focus on the evidence presented." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Mezrioui*, 26 Conn. App. 395, 403–404, 602 A.2d 29, cert. denied, 224 Conn. 909, 617 A.2d 169 (1992).

Once again, in count one of its substitute long form information, the state charged that "on or about November 21, 2012, at approximately 11:45 a.m. at an apartment building on Fifth Avenue in Danbury . . . [the defendant] engaged in sexual intercourse with another person and such other person was under thirteen years of age and the actor was more than two years older than such other person. To Wit: a three year old minor female, in violation of . . . § 53a-70 (a) (2)." In count five of its substitute long form information, the state charged the defendant "with the crime of sexual assault in the fourth degree and charges that on or about November 21, 2012, at approximately 11:45 a.m. at an apartment building on Fifth Avenue in Danbury . . . [the defendant] intentionally subjected another person to sexual contact who was under thirteen years of age and the actor was more than two years older than such person. To Wit: a three year old minor female, in violation of . . . § 53a-73 (a) (1) (A)."[10] The defendant argues, in effect, that engaging in sexual intercourse necessarily requires a defendant to subject a victim to sexual contact.

We agree with the defendant that the crimes alleged arose out of the same act. Pursuant to the *Blockburger* test, however, we conclude that sexual assault in the first degree in violation of § 53a-70 (a) (2) and sexual assault in the fourth degree in violation of § 53a-73 (a)

(1) (A) are separate and distinct crimes. Each crime requires proof of an element that the other does not. More specifically, sexual assault in the first degree requires proof of sexual intercourse, which sexual assault in the fourth degree does not; sexual assault in the fourth degree requires proof of sexual contact for the purpose of sexual gratification of the actor or the degradation or humiliation of the victim, which sexual assault in the first degree does not. Therefore, pursuant to our exercise in statutory construction, sexual assault in the fourth degree is not a lesser included offense of sexual assault in the first degree. Our review of the court's instructions to the jury reveals that the court's instructions are consistent with the proof required by each of the statutes.[11]

Although the defendant acknowledges that each of the crimes requires proof of an element that the other does not, he argues that the *Blockburger* test is not controlling if it can be determined that the legislature did not intend for a person to be punished for both crimes arising from the same act. He continues that the legislative history shows that the intent of the legislature in enacting §§ 53a-70 (a) (2) and 53a-73a (a) (1) (A) was to protect persons under the age of thirteen from being sexually assaulted and that the two crimes are parallel crimes. In other words, he states, "what a defendant could be convicted of for committing one act was a matter of degree—whether it amounted to intercourse or whether it amounted to some other sexual contact that did not constitute intercourse."

The defendant's argument is at odds with the decisional law of this court and our Supreme Court regarding the construction of the statutory scheme regarding sexual assault. For example, in *State* v. *Sirimanochanh*, 224 Conn. 656, 620 A.2d 761 (1993), our Supreme Court agreed that this court properly had determined that "[s]exual assault in the fourth degree requires proof of the element of sexual contact for the purpose of sexual gratification of the actor or degradation or humiliation of the victim, whereas sexual assault in the second degree has no such element. The latter crime requires proof of sexual intercourse whereas the former crime does not. Each crime, therefore, requires proof of an element that the other does not." (Internal quotation marks omitted.) Id., 662–63. In *State* v. *Milardo*, 224 Conn. 397, 618 A.2d 1347 (1993), our Supreme Court concluded that attempted sexual assault in the third degree in violation of General Statutes § 53-72a is not a lesser included offense of attempted sexual assault in the first degree in violation of § 53a-70 because the former requires proof of an additional element not found in the crime of attempted sexual assault in the first degree, namely, that the defendant intended to compel sexual contact for the purpose of either the sexual gratification of the actor or the humiliation or degradation of the victim. Id., 417.

In *State* v. *Mezrioui*, supra, 26 Conn. App. 395, this court determined that the 1989 versions of the statutes prohibiting sexual assault in the first degree; General Statutes (Rev. to 1989) § 53a-70 (a); and sexual assault in the third degree; General Statutes (Rev. to 1989) § 53a-72a (a) (1) (B); were separate crimes. The latter crime required proof of sexual contact for the same purpose as sexual assault in the fourth degree, which is at issue here.[12] *State* v. *Mezrioui*, supra, 405–406. In *State* v. *Henry*, 76 Conn. App. 515, 820 A.2d 1076, cert. denied, 264 Conn. 908, 826 A.2d 178 (2003), in the context of a claim of improper jury instructions, this court determined that neither sexual assault in the third degree nor sexual assault in the fourth degree are lesser included offenses of sexual assault in the first degree. Id., 549–51.

Therefore, for the foregoing reasons, the defendant's claim that his convictions of sexual assault in the first degree and sexual assault in the fourth degree violate his right not to be punished twice for the same crime fails.

## II

### *BATSON* CLAIM

The defendant's third claim is that the court erred by rejecting his *Batson*[13] challenge because the reasons given by the state for using a peremptory challenge to excuse a venireperson, M.B.,[14] were pretextual and not supported by the record.[15] We disagree.

The following procedural history is relevant to the defendant's claim. During voir dire, M.B. was first questioned by the defendant and then by the state. The defendant accepted M.B. as a juror, but the state exercised one of its peremptory challenges. The court excused M.B.. Thereafter, defense counsel stated that M.B. was not a United States native, he was of Brazilian descent, and asked the state to articulate a race-neutral reason as to why it did not accept M.B. as a juror. Defense counsel also stated that this instance was the second time that the state had exercised a peremptory challenge with respect to a minority status individual. The prosecutor responded that her exercise of a peremptory challenge had nothing to do with M.B.'s race. "It had to do with his being confused to some of the questions and his answers to those questions,[16] and that I was concerned about. . . . And the ability to come into judgment on another human being.[17] We had some concerns about that aspect also." (Footnotes added.)

The court stated its understanding of the defendant's *Batson* challenge as being related to minorities in general. The state noted that it had accepted a Hispanic male on the panel, but that it had excused a twenty-year old African American male on the basis of his youth and life experience. The court reviewed the history of

jury selection in the present case with respect to the manner in which the state questioned members of the venire panel, used its peremptory challenges, and whether there was a suggestion of systematic discharge of minority jurors. The court found: "one, that the response with regard to why the state exercised a peremptory with regard to this specific juror is not pretextual, that there is in fact a basis on the record with regard to the questions that were asked and the responses. The court will additionally find that, after looking back at the selection process in total, that there is no systematic exclusion of minority jurors. I do agree that there are minorities on this jury. . . . The state has only used [inaudible] peremptory challenges in total, and so this court is making a finding that there is no, in this court's opinion, systematic excuse with regard to minorities and that the reason given for the excuse [of M.B.] in particular is race-neutral."

On appeal, the defendant argues that the record does not support that state's reasons for exercising a peremptory challenge with regard to M.B. and that the court erred in finding that the state did not act in a purposefully discriminatory manner in selecting the jury. We are unpersuaded. Although the defendant acknowledges that English may not be M.B.'s first language and that M.B. was not particularly articulate, he claims that the record does not reveal that M.B. did not understand the questions put to him. We disagree with the defendant's claim that the state's reasons for exercising a peremptory challenge with respect to M.B. was pretextual, as we conclude that the reasons given for excusing M.B. were race neutral, were supported by the record, and were appropriate. See footnotes 15 and 16 of this opinion.

"Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." (Internal quotation marks omitted.) *State* v. *Edwards*, 314 Conn. 465, 483, 102 A.3d 52 (2014). "The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause." (Internal quotation marks omitted.) Id. "[S]uch challenges generally may be based on subjective as well as objective criteria . . . ." (Internal quotation marks omitted.) Id.

"[I]n *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough

a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the [e]qual [p]rotection [c]lause forbids [a party] to challenge potential jurors solely on account of their race . . . ." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 484.

"Under Connecticut law, a *Batson* inquiry involves three steps. First, a party must assert a *Batson* claim . . . . [Second] the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the [e]qual [p]rotection [c]lause as a matter of law. . . . At this stage, the court does not evaluate the persuasiveness or plausibility of the proffered explanation but, rather, determines only its facial validity—that is, whether the reason on its face, is based on something other than the race of the juror." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 484–85.[18] "The second step of the *Batson* inquiry involves a determination of whether the party's proffered explanation is facially race neutral and, thus, is a question of law. . . . Because this inquiry involves a matter of law, [an appellate court exercises] plenary review." (Citations omitted.) Id., 487.

"In the third step, the burden shifts to the party asserting the *Batson* objection to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual." (Internal quotation marks omitted.) Id., 485. "The third *Batson* step, however, requires the court to determine if the prosecutor's proffered race neutral explanation is pretextual. . . . Deference [to the trial court's findings of credibility] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations. . . . Whether pretext exists is a factual question, and therefore, [an appellate court] shall not disturb the trial court's finding unless it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) Id., 489–90.

In the present case, the trial court found that "the response with regard to why the state exercised a peremptory with regard to [M.B.] is not pretextual, that there is in fact a basis on the record with regard to the questions that were asked and the responses." On the basis of our review of the record, we conclude that the court's finding that the state's exercise of a peremptory challenge to excuse M.B. was not pretextual is supported by the record and not clearly erroneous. The defendant's *Batson* claim, therefore, fails.

III

## MEDICAL RECORDS CLAIM

The defendant's fourth claim is that the court abused its discretion by failing to disclose all of mother's psychiatric and medical records to him. We disagree.

We begin with the applicable law and standard of review. In *State* v. *Esposito*, 192 Conn. 166, 179–80, 471 A.2d 949 (1984), our Supreme Court established the procedure to be used for the disclosure of confidential records for the purpose of protecting a defendant's constitutional right to confront witnesses against him. *State* v. *Cecil J.*, 291 Conn. 813, 828 n.12, 970 A.2d 710 (2009). "Confrontation means more than the right to confront the witness physically; the primary interest secured by confrontation is the right of cross-examination." *State* v. *Esposito*, supra, 178. "The capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination. If as a result of a mental condition such capacity has been substantially diminished, evidence of that condition before, at and after the occurrence and at the time of the trial, is ordinarily admissible for use by the trier in passing on the credibility of the witness." Id., 176. "[I]n some instances, otherwise privileged records, like the ones in [the present] case, must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility." *State* v. *Slimskey*, 257 Conn. 842, 853–54, 779 A.2d 723 (2001).

The right to confront witnesses "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Internal quotation marks omitted.) Id., 854. "The need to balance a witness' statutory privilege to keep psychiatric records confidential against a defendant's rights under the confrontation clause is well recognized." Id., 855. "If, for purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness." (Internal quotation marks omitted.) Id.

"Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera

inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal." (Internal quotation marks omitted.) *State* v. *Kemah*, 289 Conn. 411, 425–26, 957 A.2d 852 (2008).

"[I]f the trial court discovers material exculpatory evidence in the course of an in camera inspection, it has a duty to disclose it to the defense and the defendant has a due process right to its disclosure. . . . The defendant [is] not entitled, however, to an unlimited inspection of [confidential documents] in the hope of discovering material evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Harris*, 227 Conn. 751, 762, 631 A.2d 309 (1993).

"With respect to a trial court's consideration of whether to allow a defendant access to requested confidential materials, [our Supreme Court has] held that, upon a proper showing and after an in camera review, [a]ccess to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records. . . . When a defendant seeks access to confidential records for impeachment purposes, the trial court must determine whether [the records] sufficiently disclose material especially probative of the [witness'] ability to comprehend, know, and correctly relate the truth . . . . Moreover, [our Supreme Court] has held that [t]he determination of materiality . . . [is] inevitably fact-bound and like other factual issues is committed to the trial court in the first instance." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 403, 844 A.2d 810 (2004).[19]

In the present case, the record discloses the following relevant procedural history. On April 10, 2014, the defendant filed a request that the state disclose all of mother's medical records, particularly her mental health records, on the ground that they were exculpatory and necessary for cross-examination of her. In response, the prosecutor issued a subpoena to the Department of Mental Health and Addiction Services, Western Connecticut Mental Health Network. In response to the subpoena, an assistant attorney general filed a motion to quash the subpoena.[20] The prosecutor also objected to the disclosure of mother's mental health records. The court held a hearing on the motion to quash on April 30, 2014, and denied the motion to quash but ordered that the subject records be delivered to the clerk's office under seal. The court ordered that

neither party was to receive copies of the documents.[21]

The court held a hearing pursuant to *State* v. *Esposito*, supra, 192 Conn. 166, on May 6, 2014. At the hearing, the defendant represented to the court that he was aware that mother has received considerable mental health services and has been treated for substance abuse "that may have an impact on her ability to perceive, recall, and disclose, all of which goes to a proper examination of this witness." More particularly, the defendant represented that mother suffers from schizophrenia and may or may not take medication that affects her ability to perceive, recall, and adequately report. The state objected to the disclosure of mother's medical records, arguing that the defendant had not made the requisite showing that mother's credibility, or her ability to perceive or recall was at issue. The court stated that the case law is clear that drug use goes to the ability to recall and relate information accurately to the jury. It, therefore, concluded that there is potential for this information to be imperative for the defendant in terms of cross-examination, but tended to disagree with the defendant that a ten year period of time was appropriate, noting that for the court to disclose the medical records, the records must relate to the specifics of mother's ability to testify, her ability to recall or comprehend what she is recollecting in terms of what occurred during the time period relating to the underlying incident. The court also stated that it could not conduct an in camera review unless mother agreed to it. Mother subsequently agreed to the court's in camera review of her medical records and to the disclosure of her records that the court thought relevant to the defendant's cross-examination of her.

The court stated on the record: "Having looked at everything, I will also say this for the record, that what is being handed over, while it may seem like it's a lot, and it certainly is a lot. It is to a large extent duplicative in that it's the continued diagnosis from one date to the next, which isn't necessarily saying something different but is continuing to address the same diagnosis. So, to a large extent, the documents duplicate each other in what they are providing to counsel."

On appeal, the defendant has asked this court to review mother's medical records to determine if there are other documents that are probative of her ability to comprehend, recall, and accurately convey the truth. He argues that the documents disclosed by the trial court, following its in camera review, suggest that there might be additional documents that should have been disclosed. The state agreed that this court should conduct an in camera review of mother's medical records to determine whether the trial court abused its discretion by not providing the defendant access to more of mother's medical records. Following a lengthy in camera review of the subject records, we agree that many

of the records are duplicative and find that the court did not abuse is discretion by limiting the records to be disclosed to the defendant. In fact, we commend the court for the manner in which it, with the agreement of counsel, disclosed summaries of mother's medical record history, which the trial court stated gave a better account and a flavor of the full history and diagnosis of mother. We, therefore, conclude that the defendant's right to cross-examine mother was not violated and his claim as to the disclosure of mother's medical records fails.[22]

As set forth in part I A of this opinion, the defendant's conviction of attempt to commit sexual assault in the first degree must be vacated and the defendant must be resentenced by the trial court.[23]

The judgment with respect to the defendant's conviction of attempt to commit sexual assault in the first degree is reversed and the case is remanded with direction to vacate that conviction and to resentence the defendant consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] The court sentenced the defendant on count one, sexual assault in the first degree, to twenty-five years in the custody of the Commissioner of Correction, suspended after ten years and twenty-five years of probation, and lifetime sex offender registration. As to count two, attempted sexual assault in the first degree, the court sentenced the defendant to ten years in prison concurrent with the sentence on count one. As to count three, risk of injury to a child, the defendant was sentenced to prison for twenty years, execution suspended after ten years, the sentence to be concurrent with the sentence on count two but consecutive to count one. With regard to count five, sexual assault in the fourth degree, the defendant was sentenced to five years, concurrent with the sentence on count two, but consecutive to counts one and three. The defendant's total effective sentence is forty-five years, execution suspended after twenty-five years with twenty-five years of probation.

The state contends that there is a mathematical error in the court's calculation of the total effective sentence, arguing that it is fifty rather than forty-five years. Any mathematical or clerical error is to be corrected at the time the defendant is resentenced.

[2] See *Batson* v. *Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 906 L. Ed. 2d 69 (1986).

[3] Mother understood "chupa chapa" to mean "suck vagina."

[4] The English translation of the defendant's statement is as follows: "I went to [mother's] house. The following happened. [Mother] left me with [the victim] a moment because [mother] went out. I don't know where to. And when she came back, I was lowering [the victim's] pants to check for poop and pee too . . . and [mother] arrived at that moment and she saw the zipper of my pants down. But the pants were tied because the zipper affects me when I bend forward. I have problems with the scar from [an] operation and my penis does not work. Later I went to the bathroom to urinate. Later I washed my penis because it was smelly because [it had been] days [since] I had bathed. I washed my hands and I left. [Mother] was angry. I don't like to argue with anyone or fight. Days later I called [mother] and she told me to go and talk to the police and I did it with no problem."

[5] The court dismissed the charge of risk of injury to a child in violation of § 53-21 (a) (1) before the case was submitted to the jury.

[6] General Statutes § 53a-70 (a) provides in relevant part: "A person is

guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

General Statutes § 53a-65 (2) provides in relevant part: " 'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. . . ."

[7] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[8] See footnote 6 of this opinion.

[9] General Statutes § 53a-73a (a) provides in relevant part: "Any person is guilty of sexual assault in the fourth degree when: (1) Such person intentionally subjects another person to sexual contact who is (A) under thirteen years of age and the actor is more than two years older than such other person . . . ."

General Statutes § 53a-65 (3) provides: " 'Sexual contact' means any contact with the intimate parts of a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person."

[10] The defendant filed a motion for a bill of particulars and statement of essential facts on March 19, 2014. The state responded to the defendant's motion by filing a response, stating that it "provided the defendant with a Long Form Information dated March 3, 2014 that provides the defendant with the necessary information requested." The March 3, 2014, long form information contains the same allegations charged in the state's long form information filed on May 20, 2014, which was the operative trial information. The defendant did not thereafter pursue his request for a bill of particulars. The burden is on the defendant to request a bill of particulars and a statement of essential facts more precisely defining the manner in which he committed the offense. *State* v. *Osman*, 21 Conn. App. 299, 310, 573 A.2d 743 (1990), rev'd on other grounds, 218 Conn. 432, 589 A.2d 1227 (1991).

[11] The court charged in relevant part: "For you to find the defendant guilty of [sexual assault in the first degree], the state must prove the following elements beyond a reasonable doubt. Element one, the first element is that the defendant engaged in sexual intercourse with the complainant. Sexual intercourse, for purposes of this case, means vaginal intercourse. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse.

* * *

"For you to find the defendant guilty of [sexual assault in the fourth degree], the state must prove beyond a reasonable doubt the following elements. Element one is sexual contact. The first element is that the defendant intentionally subjected the complainant to sexual contact. 'Sexual contact' means any contact by the defendant with the intimate parts of the complainant. 'Intimate parts' means the genital area, any substance emitted therefrom, groin, inner thighs or buttocks. To constitute sexual contact, there must be an actual touching. There need not be, however, direct contact with the unclothed body of the other person of the defendant. It is enough if the touching of the genital area, the groin, the inner thighs, or the buttocks was through the other person's clothes or the defendant's clothing. The second element is that the defendant had the specific intent to obtain sexual gratification."

The jury was not asked to answer any interrogatories as to the manner in which the defendant had sexual contact with the intimate parts of the victim.

[12] In his brief, the defendant asks this court to overrule *State* v. *Mezrioui*, supra, 26 Conn. App. 395. "[I]t is axiomatic that one panel of this court cannot overrule the precedent established by a previous panel's holding." (Internal quotation marks omitted.) *Samuel* v. *Hartford*, 154 Conn. App. 138, 144, 105 A.3d 333 (2014). This court often has stated that "this court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is

heard en banc." (Internal quotation marks omitted.) *Staurovsky* v. *Milford Police Dept.*, 164 Conn. App. 182, 202, 134 A.3d 1265, cert. granted on other grounds, 321 Conn. 915, 136 A.3d 645 (2016); see also Practice Book § 70-7.

Our Supreme Court has stated with respect to the role of appellate courts, "case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. . . . More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494–95, 923 A.2d 657 (2007). Moreover, "[w]e presume that the legislature is aware of our interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *McDonough* v. *Connecticut Bank & Trust Co.*, 204 Conn. 104, 119, 527 A.2d 664 (1987).

Inasmuch as this court decided *Mezrioui* in 1992 and the legislature has not taken an action to correct this court's construction of the statutes discussed therein, we must presume that the legislature concurs with this court's construction of the statutes. See *Staurovsky* v. *Milford Police Dept.*, supra, 164 Conn. App. 202.

[13] See *Batson* v. *Kentucky*, 478 U.S. 79, 89, 106 S. Ct. 1712, 906 L. Ed. 2d 69 (1986) (use of peremptory challenge to strike venireperson on basis of *race* violates equal protection clause of federal constitution). The record in the present case does not disclose M.B.'s race, but it does indicate that he is a native Brazilian. The defendant's argument is predicated on the fact that M.B. is a Brazilian, which relates to his national origin, not his race. Our Supreme Court, however, has expanded the *Batson* principles to prohibit the use of preemptory challenges on the basis of ethnic origin or ancestry. See *State* v. *Rigual*, 256 Conn. 1, 8–9, 771 A.2d 939 (2001).

[14] We refer to the venireperson by his initials to protect his privacy.

[15] The defendant also argues on appeal that racial discrimination may be inferred "by the perfunctory questioning of M.B. in comparison [with] other prospective jurors" and that "all three jurors the state excused appear to be of minority status." The state argues that these claims are not reviewable because they were not raised at trial, which deprived the state of an opportunity to be heard, the trial court to make findings and to create a record for review. We agree that the claims are not reviewable because the record is inadequate. See *State* v. *Jackson*, 95 Conn. App. 400, 414, 896 A.2d 137, cert. denied, 279 Conn. 904, 901 A.2d 1226 (2006).

[16] During voir dire by defense counsel, M.B. responded, in part, to questions as follows:

"[Defense Counsel]: Speaking of police officers, have you ever had any encounters with any police officers? Negative or positive.

"[M.B.]: I just—one encounter I have is five or six years ago they stopped me on a stop sign violation.

"[Defense Counsel]: Okay.

"[M.B.]: That's all.

"[Defense Counsel]: And how'd that go?

"[M.B.]: Oh, nice. He tell me I don't stop in stop sign, and I tell him I stop.

"[Defense Counsel]: Okay.

"[M.B.]: And a couple of minutes conversation he just give a warning and he send me home. That's all.

"[Defense Counsel]: So you just had a warning.

"[M.B.]: Yes, he gave a warning.

"[Defense Counsel]: Okay. So, you never had to come to court for that.

"[M.B.]: No.

"[Defense Counsel]: Okay.

"[M.B.]: Because, as I stop in stop sign, I saw his car in my left with lights off. And I explained to him why I think he—I mean, I will guilt because I saw him, I stopped and drive by to pick up my daughter. After that, he just

give me warning to be careful and let me go."

[17] During voir dire by defense counsel, M.B. responded, in part, to questions as follows:

"[Defense Counsel]: Is there anything about the fact that this case you may hear testimony regarding a minor, is there anything about that fact alone that causes you concern about sitting on this jury?

"[M.B.]: No.

"[Defense Counsel]: Why not?

"[M.B.]: I'm a Christian. If I go to serve as a jury, I have my conscience is drive why is the God teaching about in the Bible. And as God's preach in the Bible, justice by a rule."

When questioned by the prosecutor, M.B. responded, in part, as follows:

"[The Prosecutor]: And do you think that you're a pretty good judge of character?

"[M.B.]: Character?

"[The Prosecutor]: Yeah, do you think you're a pretty good judge of character?

"[M.B.]: I'd like to say 'yes' because I'm a Christian.

"[The Prosecutor]: Right.

"[M.B.]: I don't judge people."

[18] Our Supreme Court has "identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race . . . were asked a question to elicit a particular response that was not asked of other jurors . . . (4) person with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . ." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 485–86.

[19] In *James G.*, our Supreme Court concluded that the trial court did not abuse its discretion in denying that defendant access to confidential records of the complainant after it reviewed sealed documents and determined that they did not "contain exculpatory or impeachment evidence or evidence relating to [complainant's] ability to comprehend, know or correctly relate the truth . . . ." (Internal quotation marks omitted.) *State* v. *James G.*, supra, 268 Conn. 403.

[20] The motion to quash was filed pursuant to General Statutes § 52-146e and 42 C.F.R. Part 2.

[21] The records are voluminous, covering more than a decade of mother's mental health history. The court estimated that probably thousands of pages of documents were provided in response to the subpoena.

[22] Even if we were to have found that the trial court abused its discretion by failing to disclose additional medical records, we would conclude that such abuse of discretion did not violate the defendant's constitutional right to confrontation, as it is harmless beyond a reasonable doubt. See *State* v. *Bruno*, 197 Conn. 326, 336, 497 A.2d 758 (1985) (*Shea, J.*, concurring).

The record discloses that, at trial, mother testified that at the time of the events underlying the defendant's conviction, she was being closely followed by Western Connecticut Mental Health Network for a psychiatric disorder and support of her daily function. She was taking the medication prescribed for her. Mother described herself as emotionally frustrated by the defendant's drinking. She was able to care for herself, her daughter, and to work for fifteen to twenty hours weekly at Catholic Charities. On cross-examination, mother testified that she had been hospitalized for schizophrenia, perhaps thirty-five times, and that when she was thirteen or fourteen years of age she was delusional and had experienced hallucinations and paranoid thoughts.

In its brief, the state states that mother testified that she suffers from schizoaffective disorder; has a history of psychosis, paranoid thoughts, hallucinations and delusions; has heard conversational chatter in her mind, talks to herself to discharge energy, and has an overactive imagination; in the past, has dialed 911 to report seeing things that were not there, is a recovering alcoholic, who historically and periodically abused crack cocaine, LSD, powder cocaine, heroin, and marijuana, used heroin only a week prior to the present trial and recently had been discharged from a detoxification program, had once been found not competent by the Superior Court and

was sent to Connecticut Valley Hospital to be restored, and had been discharged from a recovery program for smoking crack cocaine and from another program for allowing her urine to be substituted for another's drug test.

Our Supreme Court has applied the harmless error doctrine to uphold a defendant's convictions despite the erroneous admission of testimony at trial, where there was overwhelming evidence of the defendant's guilt. *State* v. *Bruno*, supra, 197 Conn. 335–36. As a matter of law, we conclude that the evidence against the defendant was so overwhelming as to render any possible error harmless beyond a reasonable doubt. See id. Mother's psychiatric and substance abuse history was before the jury. The record does not reveal that mother was not able accurately to perceive or relate the events that underlie the defendant's conviction. There is symmetry between mother's reporting the events to the police, her testimony at trial and the defendant's statement to the police. Moreover, the DNA evidence established that the defendant's biological material was present on the intimate parts of the victim.

[23] See footnote 1 of this opinion.

––––––––––––––––––––––––––––––––