STATE OF CONNECTICUT *v.* ANDREW ESPOSITO
(10070)

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and SHEA, Js.

---

Argued November 2, 1983—decision released February 7, 1984

*G. Douglas Nash,* assistant public defender, with whom was *Kenneth Rosenthal,* assistant public defender, for the appellant (defendant).

*William P. Mahoney,* legal intern, with whom were *Robert J. O'Brien,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, and *Guy W. Wolf III,* assistant state's attorney, for the appellee (state).

PARSKEY, J. On a trial to a jury the defendant was convicted of the crimes of kidnapping in the second degree and sexual assault in the first degree in violation of General Statutes §§ 53a-94 (a) and 70 (a) (1) respectively. In his appeal the defendant asserts that the trial court erred in (1) admitting evidence of a prior sexual assault; (2) permitting the state's medical expert to give testimony concerning other rape complainants; and (3) denying the defendant's oral motion to inspect or to have the court inspect in camera psychiatric records of the victim-witness. We find no error.

The jury could reasonably have believed the following facts. The complainant, Ms. B, was employed at a division of the Office for the Comprehensive Employment and Training Act Program (CETA) in New Haven. About one o'clock in the afternoon of May 24,

1979, she left her place of employment and walked to the Blubartz Cafe for lunch. There she met an acquaintance who was accompanied by two friends, one of whom was the defendant. The defendant and B had met once several years previously. In the course of their conversation B learned that the defendant worked for another division of CETA in New Haven and that the two of them had mutual acquaintances. Eventually the others departed leaving the defendant alone with B. The defendant told B that he had to go to his CETA division office and pick up a check as he would soon be going to California on a vacation and requested that she accompany him. B agreed, and the two left after finishing the beers which they had been drinking.

B and the defendant arrived at the office, where the defendant went off, apparently to take care of his stated business. He returned a short while later and the two left the office. As they were crossing an adjoining parking lot, the defendant pulled out a knife, which he placed against B's throat. Stating that he had used a knife before, he grabbed B's arm and forced her to accompany him to his apartment which was several blocks away.

At the apartment the defendant continued to display the knife, and repeated that he had used it before and would not be afraid to use it again. The defendant then forced B to have sexual relations with him, compelling her to submit to oral and vaginal intercourse. After raping her, the defendant showed B a picture of his children. He then accompanied her back to the Blubartz Cafe.

B also testified to various events which took place later that day, including her being threatened by the defendant and her informing her boyfriend and the police about the assault. Later that evening when B

was examined at the Yale-New Haven Hospital by Stephanie Spangler, a physician, she exhibited no evidence of trauma in the vaginal area.

## EVIDENCE OF PRIOR SEXUAL OFFENSE

The state offered evidence that some five weeks before the date of this crime, the defendant had sexually assaulted Ms. Y. The state claimed that the evidence would show a common design or plan. The defendant objected on the grounds that the two incidents were not sufficiently similar to constitute a common design or plan and that, in any event, the evidence should be excluded because its prejudicial impact outweighed its probative value. The trial court properly admitted the evidence.

Evidence of similar but unconnected crimes is excluded because it violates the rule of policy which forbids the state initially to attack the character of the accused and also the rule of policy that bad character may not be proved by particular acts. *State v. Jenkins,* 158 Conn. 149, 152, 256 A.2d 223 (1969); *State v. Gilligan,* 92 Conn. 526, 530, 103 A. 649 (1918). "On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, or the existence of any essential element of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial." *State v. Jenkins,* supra, 152–53. The state claims that the offered evidence was admissible to show a common design or plan. Evidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan where the prior offenses (1) are not too remote

in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness. *People* v. *Thomas,* 20 Cal. 3d 457, 464, 573 P.2d 433 (1978); *People* v. *Jackson,* 102 Cal. App. 3d 620, 625, 162 Cal. Rptr. 574 (1980). In this case the prior offense is not too remote, allegedly having occurred some five weeks before the offense charged, and the victim of the previous offense was similar to the prosecuting witness. The only remaining questions, therefore, are whether the prior offense was sufficiently similar to the offense charged to show a pattern of common design or plan and if so whether, on balance, the evidence should have been excluded.

Y, who was 28, testified that on April 16, 1979, she had been arrested on a disorderly conduct charge as a result of an altercation with her estranged husband. Later, when she was released, she found herself in a part of New Haven with which she was not familiar. She crossed the street and waited for a cab in front of the railroad station. While she was waiting, the defendant, accompanied by another man, walked up and began speaking with her. Y and the defendant had met on one previous occasion, having been introduced to each other by a mutual friend. In response to questioning by the defendant Y explained that she was waiting for a cab or bus to take her downtown. The defendant stated that he was headed in that direction and asked whether she wanted to walk with him. Y agreed and the three of them began walking. Eventually the other man went off in a different direction leaving the defendant alone with Y.

As they were walking they came up to the Nutmegger Bar, and the defendant suggested that they go in and have a drink. They went inside and the defendant ordered two beers, both of which he eventually drank. The defendant also arranged with a friend there that he and Y be given a lift home. While in the bar Y told

the defendant about the incident for which she had been arrested, and in general about the difficulties she had had with her husband. The defendant then told her that he was moving to New York and that he had some furniture which he was selling at a very low price. Y agreed to go see it and when they left the bar the defendant's friend drove them to the defendant's apartment.

While the friend waited in the car, Y and the defendant went upstairs. Inside the apartment the defendant showed her the items he said were for sale and also some pictures of his son. Eventually, the friend downstairs began blowing the car horn. At this point, the defendant pulled out a knife and held it to Y's throat. Stating that he had nothing to lose because he had "a lot of time" facing him, the defendant ordered her to keep quiet and to remove her clothes. Y complied and the defendant then sexually assaulted her, forcing her to engage in oral and vaginal intercourse, all the while retaining hold of the knife. He then had Y get dressed and walked her to her home, which was two blocks away from his own. Because she was afraid of the defendant, who lived so near to her, Y waited a few days before contacting the police and eventually chose not to have the matter prosecuted.

It is a matter of common knowledge that persons engaged in criminal activity have a tendency to commit the same type of offense each time the same way. This modus operandi is the hallmark of criminal activity. Identity evidence may serve a variety of purposes. As a criminal logo it may identify a person. It may also characterize a particular crime and thus negative other inferences or explanations. Common plan evidence, for example, may negative a claim that specific conduct resulted from accident or inadvertence, or was justified by self-defense. *State* v. *Jenkins,* supra, 156. In a sexual assault case, it may serve to negative a claim

that the sexual intercourse engaged in by the parties was consensual. *People* v. *Jackson*, supra.

When evidence of other offenses is offered to show a common plan or design the marks which the uncharged and the charged offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other. *People* v. *Cramer*, 67 Cal. 2d 126, 129, 429 P.2d 582, 60 Cal. Rptr. 230 (1967). "It is apparent that the indicated inference does not arise, however, from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together." (Footnotes omitted.) *People* v. *Haston*, 69 Cal. 2d 233, 245–46, 444 P.2d 91, 70 Cal. Rptr. 419 (1968).

Sexual assault in the first degree consists of the actor compelling another person to engage in sexual intercourse by the use or threatened use of force. If the common plan or scheme of the actor embraces compelled sexual intercourse then evidence tending to show the common scheme will also tend to establish the doing of the forbidden conduct. *United States* v. *Danzey*, 594 F.2d 905, 913 (2d Cir.), cert. denied sub nom. *Gore* v. *United States*, 441 U.S. 951, 99 S. Ct. 2179, 60 L. Ed. 2d 1056 (1979); 2 Wigmore, Evidence (3d Ed. 1940) § 304, p. 202. Since conceptually compulsion and consent are antonymous in effect, if not in meaning, it would follow that any act engaged in under compul-

sion would necessarily be nonconsensual. In that sense evidence of a common plan or scheme to engage in compelled sexual intercourse would tend to negate a defense of consent. *Williams* v. *State,* 110 So. 2d 654, 663 (Fla. 1959); *State* v. *Hampton,* 215 Kan. 907, 529 P.2d 127 (1974); *People* v. *Oliphant,* 399 Mich. 472, 250 N.W.2d 443 (1976).

Recently, in *State* v. *Williams,* 190 Conn. 104, 459 A.2d 510 (1983), we rejected the admission of "other crimes" evidence on the issue of consent in a sexual assault case. *Williams* is distinguishable from the present case. In *Williams* the trial court admitted testimony of a neighbor, proffered by the state as probative of a common scheme or modus operandi, that about two months before the incident on trial the defendant had gained entry into the victim's apartment in the early hours of the morning by telling her that he had to use the phone in an emergency. After he purportedly had used the phone and as he was walking out the door he remarked, "I was going to rape you." Id., 107. In the incident on trial the victim awoke during the night and discovered the defendant in her room. The defendant stated that he wanted to call a taxicab and thereafter, threatening to kill the victim if she screamed, sexually assaulted her. We noted that the two incidents were very dissimilar, that the probative value of the neighbor's testimony, which was minimal, at best, was substantially outweighed by its prejudicial effect. Id., 109. At no point in *Williams* did we suggest that a solid modus operandi could not be used to negative consent in a sexual assault case.

Although the sexual assault upon Y is not the duplicate image of the sexual assault on B there are sufficient marks of similarity to justify the conclusion that it is at the very least a reasonable facsimile. In both cases the defendant had been drinking; knew the victim, who was around thirty; first engaged her in

friendly conversation; as part of a ruse to induce the victim to accompany him, explained that he would shortly be leaving for another state; used a knife at the victim's throat; indicated his willingness to use the knife; brought the victim to his home and attacked her there; forced the victim to submit first to oral then to vaginal intercourse; showed the victim pictures of his family; and accompanied the victim to her next destination. Additionally, the circumstances under which the victims were sexually assaulted were such as to make it easier for the defendant to claim later that there had been consent.

The defendant argues that the introduction of the Y incident into the case placed him in an untenable position to his prejudice in that (1) it compelled him to present two incompatible and different defenses to each of the occurrences; (2) it permitted the state to introduce a trial within a trial thus diverting the jury's focus away from the crime charged; (3) it permitted the state to secure a conviction based on the defendant's bad character rather than because he committed the offense with which he was charged. We are unpersuaded. The state correctly observes that the Y incident boiled itself down to a question of Y's credibility. The defendant's position was that the Y incident did not take place and he so testified. There was nothing inconsistent between his denial of the Y incident and his assertion that the B occurrence was consensual. Moreover, since the Y incident was directly related to the question of the defendant's modus operandi it was logically related to the crime charged and therefore could not fairly be characterized as diversionary. As for the bad character aspect of the Y incident, any prejudicial impact from the introduction of such evidence was more than outweighed by its probative force.

## EVIDENCE CONCERNING OTHER RAPE COMPLAINANTS

Stephanie Spangler, a physician in gynecology and obstetrics at Yale-New Haven Hospital, examined the victim, B, at the hospital on the evening of the sexual assault. She testified as an expert for the state that upon examination she found no evidence of trauma in the area of the vagina. Over objection by the defendant she testified that in fourteen out of fifteen cases where she had conducted a physical examination of rape complainants she had found no evidence of vaginal trauma. She opined that the absence of vaginal trauma in B's case was consistent with her findings in the cases of other rape complainants. The defendant objected to the doctor testifying about the results of her physical examination of fifteen rape complainants on the ground that the doctor was not qualified as a legal expert to give an opinion as to whether any of these individuals were rape victims. The court's ruling was correct.

The defendant misses the thrust of the doctor's testimony. "[E]xpert testimony may be admitted if the witness has a special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue." *Siladi* v. *McNamara*, 164 Conn. 510, 513, 325 A.2d 277 (1973). The knowledge may be derived from reading alone, or from experience alone or from both. McCormick, Evidence (2d Ed.) § 13, p. 30. A physician, who is consulted by a patient for the purpose of obtaining from her professional medical treatment or advice incidental thereto, may testify to her opinion even though it is based, in whole or in part, on statements made to her by the patient; and, of course, she may also testify to such statements. *Brown* v. *Blauvelt,* 152 Conn. 272, 274, 205 A.2d 773 (1964). Spangler was thus qualified not only to render an opinion based on her

examination of women patients who gave her a history of having been the victims of sexual assaults but she could also relate the complaints that formed a part of the patient's medical history. *Gilmore* v. *American Tube & Stamping Co.,* 79 Conn. 498, 504, 66 A. 4 (1907). Obviously, a rape complainant is not necessarily a rape victim. Challenges to proffered evidence of rape complaints on the ground that they do not establish as a fact that the complainants were rape victims go to the weight of the evidence, not to its admissibility.

### EXAMINATION OF PSYCHIATRIC RECORDS

In response to a pretrial subpoena duces tecum, certain records of the Connecticut Mental Health Center pertaining to B were produced. The defendant, claiming that he had a federal and state constitutional right to the production and use of relevant impeaching evidence, orally moved that he be permitted to inspect these records for the purpose of cross-examining B or, in the alternative, that the court examine these records in camera in order to determine whether they contained relevant impeaching information. The trial court denied the motion on the ground that there was no authority to breach the confidentiality of these records.

The capacity of a witness to observe, recollect and narrate an occurrence is a proper subject of inquiry on cross-examination. If as a result of a mental condition such capacity has been substantially diminished, evidence of that condition before, at and after the occurrence and at the time of the trial, is ordinarily admissible for use by the trier in passing on the credibility of the witness. *Taborsky* v. *State,* 142 Conn. 619, 629, 116 A.2d 433 (1955); 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 931, p. 758. "It is indeed impossible to analyze the laws by which an unsound intellect is controlled, and to deduce any general rule by which the phenomena of 'a mind in ruins' can be tested, and

its vagaries understood and explained. The inlets to the understanding may be perfect, so far as any human eye can discern, the moral qualities may all be healthy and active, the conscience may be sensitive and vigilant, and the memory may be able to perform its office faithfully, and yet, under the influence of morbid delusions, reason becomes dethroned, false impressions from surrounding objects are received, and the mind becomes an unsafe depository of facts. The force of all human testimony depends as much upon the ability of the witness to observe the facts correctly as upon his disposition to describe them honestly, and if the mind of the witness is in such a condition that it can not accurately observe passing events, and if erroneous impressions are thereby made upon the tablet of the memory, his story will make but a feeble impression upon the hearer, though it be told with the greatest apparent sincerity." *Holcomb* v. *Holcomb,* 28 Conn. 177, 181 (1859).

General Statutes § 52-146e[1] spreads a veil of secrecy over communications and records relating to the diagnosis or treatment of a patient's mental condition. With certain exceptions not pertinent to the present discus-

---

[1] "[General Statutes] Sec. 52-146e. DISCLOSURE OF COMMUNICATIONS. (a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. Each patient shall be informed that his refusal to grant consent will not jeopardize his right to obtain present or future treatment except where disclosure of the communications and records is necessary for the treatment.

"(c) The patient or his authorized representative may withdraw any consent given under the provisions of this section at any time in a writing addressed to the person or office in which the original consent was filed. Withdrawal of consent shall not affect communications or records disclosed prior to notice of the withdrawal."

sion, the statute provides that "no person may disclose or transmit any communications and records . . . to any person, corporation or governmental agency without the consent of the patient or his authorized representative." The broad sweep of the statute covers not only disclosure to a defendant or his counsel, but also disclosure to a court even for the limited purpose of an in camera examination. Thus, the trial court properly declined the defendant's request for such examination. *State* v. *Januszewski,* 182 Conn. 142, 174, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981) (wherein we held that it was error for the trial court to refuse to examine a confidential personnel file) is inapposite. The statute involved in that case, § 1-19, does not preclude the disclosure of the contents of information contained in a personnel file in a judicial proceeding wherein it is determined that a legitimate and demonstrated need for such information is apparent. Id., 172. Nor does it preclude disclosure to the judicial authority for the limited purpose of an in camera inspection.

The sixth amendment to the constitution of the United States guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state criminal proceedings. *Pointer* v. *Texas,* 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). A similar right is embodied in article first, § 8, of the Connecticut constitution. *State* v. *Hackett,* 182 Conn. 511, 517, 438 A.2d 726 (1980). Confrontation means more than the right to confront the witness physically; the primary interest secured by confrontation is the right of cross-examination. *Davis* v. *Alaska,* 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Professor Wigmore stated: "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.* The opponent

demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct putting of questions and obtaining immediate answers." (Emphasis in original.) 5 Wigmore, Evidence (Chadbourn Rev. 1974) § 1395, p. 150.

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.,* discredit the witness." (Emphasis in original.) *Davis* v. *Alaska,* supra, 316. "The right of cross-examination is not a privilege but is an absolute right and if one is deprived of a complete cross-examination he has a right to have the direct testimony stricken." *Gordon* v. *Indusco Management Corporation,* 164 Conn. 262, 271, 320 A.2d 811 (1973).

Generally, a trial court has some discretion in the matter of discovery where material is sought for impeachment purposes. *State* v. *Januszewski,* supra, 171. If, however, the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent

is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal.

The defendant here failed to make a threshold showing that at any pertinent time B had a mental problem which affected her testimonial capacity in any respect, let alone to a sufficient degree to warrant further inquiry. B and her live-in boyfriend testified. There is nothing in the manner of B's testimony either on direct or on cross-examination to suggest that she had any problem recalling or narrating the events relating to the sexual assault. No inquiry was made of her or her boyfriend, in the absence of the jury, with respect to the date, duration and reason for B's hospitalization. For all that appears, that hospitalization may have occurred so long before the date of the assault that any information contained in the hospital records would have been subject to exclusion for remoteness. *State v. Januszewski,* supra, 173. We are not inclined to conjure up a picture of mental abnormality out of nothing more substantial than the defendant's gossamer illusions.

There is no error.

In this opinion SPEZIALE, C. J., PETERS and HEALEY, Js., concurred.

SHEA, J. (dissenting). I disagree only with the portion of the majority opinion which concludes that the evidence of an uncharged sexual assault upon another

woman, Y, was admissible to prove the defendant sexually assaulted the victim B as charged in the information. The opinion allows this evidence upon the theory that it tends to support the victim's testimony that she never consented to sexual relations with the defendant as an exception to the general prohibition against evidence of other misconduct. Such evidence has probative value upon the issue of consent, however, only in that it indicates a proclivity toward rape upon the part of the defendant when a suitable opportunity is presented. Since it is common knowledge that a disproportionately large number of crimes are attributable to "repeaters" who have previously committed the same offense, it cannot be denied that evidence of another similar crime by a defendant, whatever its nature, has significant probative force. The circumstance that this defendant has been accused of rape by another woman lends substantial persuasiveness to the account given by the victim B of her encounter with him.

It is not because other crimes evidence offered to prove criminal proclivity lacks any probative value that it is ordinarily rejected, however, but because it is commonly regarded as having too much. McCormick, Evidence (2d Ed. 1972) § 190; 1 Wigmore, Evidence (3d Ed. 1940) § 194. It violates a sense of fairness deeply ingrained in our system that a person should be convicted of a crime because of his past misdeeds. That evidence of the commission of similar crimes raises a serious danger of such a possibility is widely recognized as the principal rationale behind the exclusion of such evidence where its effect is to show nothing more than a proclivity to commit the particular crime charged. 1 Wigmore, Evidence, supra. General Statutes § 52-145 reflects this attitude by restricting the use of prior convictions to their effect upon the credibility of a witness.

The majority opinion stresses the likeness of many of the circumstances of the two incidents. These similarities might be significant if identity were the issue, but it is not. As the opinion concedes, the only issue is consent and these resemblances serve only to enhance the effect of the evidence in showing that the defendant has a proclivity toward sexual assault in like situations. It is this characteristic of the defendant which the testimony of Y tends to prove and which is relied upon as a basis for the inference that B, the victim of the offense charged, never consented to sexual relations with the defendant. There is no distinction of substance between the use of evidence of the criminal characteristics of a defendant in this context and its use to prove his commission of a crime on the basis of the notion that "he did it once; he must have done it again," of which the majority presumably disapprove. The exception which they have carved out for evidence of similar crimes to prove the absence of consent in sexual assault cases, however, bids fair to swallow in its entirety the general rule excluding such evidence. Lilly, Evidence (1978) § 46.

For these reasons, I disagree with the opinion's significant enlargement upon the availability of other crimes evidence to the state in sexual assault cases, heretofore unprecedented in this state and disapproved by some thoughtful commentators. Lilly, Evidence (1978) § 46; Gregg, "Other Acts of Sexual Misbehavior and Perversion as Evidence in Prosecutions for Sexual Offenses," 6 Ariz. L. Rev. 212, 231–35 (1965); H. L. Trautman, "Logical or Legal Relevancy—Conflict in Theory," 5 Vand. L. Rev. 385, 408–409 (1952). I would follow our recent decision in State v. Williams, 190 Conn. 104, 459 A.2d 510 (1983), where we found error in the admission of testimony tending to prove nothing more than an inclination toward rape on the part of a defendant charged with sexual assault where

consent was the sole defense, as in this case, because its probative value was deemed minimal in comparison to its seriously prejudicial impact. Accordingly, I would find error in the ruling upon evidence and remand for a new trial.