Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/04/2022 09:05 AM CDT

**State of Nebraska, appellee, v.
Gregory T. Berger, appellant.**

___ N.W.2d ___

Filed September 27, 2022.    No. A-21-402.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

3. **Trial: Rules of Evidence.** A trial court exercises its discretion in determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value.

4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5. **Trial: Evidence: Appeal and Error.** A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion.

6. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion.

7. **Records: Appeal and Error.** The procedure set forth in *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989), does not address, and therefore does not prevent, a defendant's request that the records reviewed be sealed and included as part of an appellate record.

8. ____: ____. It is incumbent upon an appellant to supply a record which supports his or her appeal. Absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed.

9. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

10. **Rules of Evidence: Expert Witnesses.** When a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, in accordance with Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.

11. ____: ____. A determination of whether an expert's opinion would assist the trier of fact initially requires a determination of relevance.

12. ____: ____. Most trial court rulings excluding expert testimony can be explained as findings by the court that the issue is inappropriate for expert resolution, either because the expert is not needed for the jury to resolve the issue or because the expert is incapable of rendering meaningful assistance.

13. **Trial: Rules of Evidence: Expert Witnesses: Appeal and Error.** The trial court's determination of whether an expert's testimony will be helpful to the jury or assist the trier of fact in accordance with Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), is a determination involving the discretion of the trial court, whose ruling on the admissibility of an expert's testimony or opinion will be upheld on appeal unless the trial court abused its discretion.

14. **Trial: Rules of Evidence: Expert Witnesses.** When an expert's opinion on a disputed issue is merely a conclusion which may be deduced equally well by the trier of fact with sufficient evidence on the issue, the expert's opinion is superfluous and does not assist the trier of fact in determining the factual issue or understanding the evidence.

15. **Trial: Expert Witnesses.** It is within the trial court's discretion to determine whether there is sufficient foundation for an expert witness to give his or her opinion about an issue in question.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

Joseph L. Howard, of Dornan, Troia, Howard, Breitkreutz, Conway & Dahlquist, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

Pirtle, Chief Judge.

## INTRODUCTION

Gregory T. Berger appeals his convictions in the district court for Douglas County for two counts of first degree sexual assault of a child and one count of third degree sexual assault of a child. Berger claims that the trial court erred in not releasing the victims' medical and therapy records to his expert witness and in not allowing his expert witness to testify. Based on the reasons that follow, we affirm.

## BACKGROUND

*Procedural History.*

On November 30, 2018, the State filed an information charging Berger with two counts of first degree sexual assault of a child and one count of third degree sexual assault of a child. The information alleged that Berger had sexually assaulted two victims, E.A. and T.H., between 2006 and 2011. The victims were between the ages of 3 and 7 at the time of their respective assaults. E.A. is Berger's biological daughter and T.H. is E.A.'s half sister. The victims have the same mother.

On July 6, 2019, Berger filed a motion to compel, seeking production of E.A.'s medical records from her former primary care physician, mental health records from her former therapist, and school records from her elementary school, including records from the school's counselor. That same day, Berger filed another motion to compel, seeking production of E.A.'s therapy records from Stefanie Armstrong and Cathy Schweitzer, who both work at The Attachment and Trauma Center (ATC) in Omaha, Nebraska. Berger asked that the records be sent to the court for an in camera review to determine whether they were relevant and had any evidentiary value in terms of the weight and credibility of E.A.

On July 26, 2019, Berger filed another motion to compel, seeking production of T.H.'s treatment, medical, and mental health records from Dr. Anne Tapley, Dr. Robert Arias, and Bryan Hospital. Berger again asked that the records be sent to the court for an in camera review.

On August 27, 2019, following a hearing, the court entered an order disposing of the motions to compel. In regard to the motion to compel production of records from E.A.'s former primary care physician, E.A.'s former therapist, and E.A.'s elementary school, the court denied the motion. In regard to the motion to compel production of records from Armstrong and Schweitzer at ATC, the court granted the motion in part, ordering that therapy records from the date of disclosure in March 2018 to the present be provided to the court for an in camera review. As to the motion to compel production of T.H.'s records from Tapley, Arias, and Bryan Hospital, the court denied the motion.

Thereafter, E.A.'s adoptive mother executed a release of E.A.'s therapy records from ATC from March 2018 to the present for purposes of an in camera review by the court and Berger subsequently subpoenaed the records from ATC.

On November 5, 2019, the State filed a motion in limine, seeking to prevent Berger "from adducing any expert witness testimony at trial regarding the credibility or reliability of the victims' accu[s]ations." The State specifically requested that the court issue an order preventing Dr. Terry A. Davis from testifying.

In January 2020, the district court completed its in camera review of E.A.'s therapy records from ATC and denied Berger's motion to compel production of those records. At a hearing on February 25, the court stated that it had reviewed the records from ATC and it received them into evidence as exhibit 1. The court also ordered that the exhibit be sealed.

In February 2020, Berger deposed Armstrong and Schweitzer, E.A.'s therapists from ATC. Following the depositions, Berger filed another motion to compel, seeking production of E.A.'s treatment records from counselor Mary Ellen Anderson, Dr. Loren Conaway, and Boys Town Residential Treatment Center. Berger requested the trial court to review those records in camera to determine if they were relevant and had any evidentiary value in terms of the weight and credibility of E.A.'s

accusations. In support of the motion, Berger submitted that in deposing Armstrong he learned that (1) E.A. was diagnosed in 2011 with post-traumatic stress disorder (PTSD), attention deficit hyperactivity disorder, and reactive attachment disorder by Anderson; (2) E.A. underwent a psychological evaluation with Conaway; (3) E.A. was admitted to Boys Town Residential Treatment Center from March 5 to June 18, 2019; and (4) E.A.'s biological mother may be bipolar, which can be hereditary. E.A.'s adoptive mother subsequently executed a release to the court for the requested records.

On March 2, 2020, Berger subpoenaed E.A.'s medical and counseling records from Anderson, Conaway, and Boys Town Residential Treatment Center. Berger also subpoenaed medical and counseling records related to T.H. from Tapley, Arias, and Bryan Hospital.

On February 17, 2021, the trial court held a hearing on the State's motion in limine to prevent Berger from presenting any expert witness testimony regarding the credibility of the victims' accusations. Berger offered four exhibits into evidence, which included Davis' psychiatric opinion report of E.A. Davis also testified at the hearing. The court then granted the State's motion in limine, finding that Davis did not have a sufficient underlying foundation on which to base an expert opinion.

On February 27, 2021, Berger filed a motion to release sealed records and a renewal of motions to release the victims' mental health records. In regard to the motion to release sealed records, he asked the court to release the sealed records in the court's custody and control from Conaway, Anderson, Boys Town Residential Treatment Center, Bryan Hospital, and Arias. The motion stated that Davis had determined that E.A. and T.H. suffer from mental health disorders that can affect memory and cause untruthful testimony. Berger argued that releasing the sealed mental health records would cure the court's concern that the records reviewed by Davis were insufficient to form an expert opinion.

As to the renewal of motions to release the victims' mental health records, Berger renewed his motions to compel the production of records filed February 23 and July 26, 2019, and requested that these records be released to Davis. The July 26 motion to compel sought production of T.H.'s records from Tapley, Arias, and Bryan Hospital. The February 23 motion to compel is not in the record before us.

A hearing on Berger's motion to release sealed records and the renewal of motions to release the victims' mental health records was held on March 1, 2021. The court overruled the motions, but allowed Berger to make an offer of proof. Berger offered into evidence a neuropsychological report on E.A. dated July 31, 2017, and a summary of T.H.'s treatment from Tapley addressed to an Omaha police detective and dated September 5, 2018. Both of these exhibits had been reviewed by Davis. The exhibits were received for purposes of the hearing and sealed. Berger also asked the court to take judicial notice of Davis' curriculum vitae and his report, both of which were offered into evidence at a prior hearing. Berger stated that if Davis were allowed to review the sealed records and testify, he would state an opinion as to whether or not the records support a specific diagnosis and how that diagnosis could affect credibility, memory, and cognition. The court accepted Berger's offer of proof, and it again overruled the motion to release sealed records and the renewal of motions to release the victims' mental health records.

*Trial.*

Berger's trial began on March 1, 2021. The State called 12 witnesses, including both of the victims. After the State rested, Berger asked to do an offer of proof in regard to the court's previous ruling on the State's motion in limine regarding E.A.'s mental health diagnosis. Berger called Armstrong to testify. Following Armstrong's testimony, Berger offered that evidence as an offer of proof and asked the court to

reconsider its admission. The court stated that it was not changing its ruling.

Berger next asked the court to dismiss the three counts against him, arguing that the State failed to meet its burden of proof. The court overruled the motion.

Berger then also offered a transcript of the February 21, 2021, motion in limine hearing where Davis testified and stated that if called to testify, Davis' testimony would be substantially similar to his previous testimony. Berger renewed his offer of proof, and the court stated the motion was still overruled.

*Relationship of Victims.*

Amy K. is the mother of E.A. and T.H. Amy divorced T.H.'s biologial father shortly before T.H. was born in September 2001. T.H. initially lived with Amy but began living with her biological father after Amy, who has a history of mental health problems, became unstable.

In 2003, Amy began dating Berger. Amy and Berger moved in together and eventually had E.A., born in May 2004, as well as another child. T.H. would sometimes visit Amy and Berger on weekends and holidays.

Amy tesified that her mental health deteriorated and that in February 2008, she left Berger and soon lost contact with E.A. and T.H. After Amy left, T.H. had no further contact with Berger or E.A. and T.H. continued living with her biological father. Berger subsequently began dating DeAnn E., who moved in with him in mid- to late 2008.

In January 2011, Child Protective Services removed E.A. from Berger's home. That same day, she was placed with Berger's parents, who became her foster parents. In October 2011, Berger's parental rights were terminated. A month later, E.A. started therapy with Armstrong.

In July 2012, E.A. began living with the couple that eventually adopted her. T.H. continued to live with her biological father.

E.A. and T.H. both eventually reconnected with Amy, but at different times. T.H. contacted Amy through social media in early 2018, without her biological father's knowledge. E.A. contacted Amy by letter in late 2019. All of E.A.'s contacts with Amy were closely monitored by her adoptive parents.

*E.A.'s Disclosure.*

On March 7, 2018, E.A., who was 13 years old at the time, told her adoptive parents that she had been sexually assaulted by Berger. Her adoptive mother contacted Armstrong, as well as the Omaha Police Department.

On March 12, 2018, E.A. met with Armstrong and told her that when E.A. was 4 years old, Berger had sexually assaulted her while DeAnn held her arms over her head. Armstrong immediately stopped the therapy session and instructed E.A.'s adoptive parents to contact law enforcement, which they did. That evening, an Omaha police officer spoke with E.A. A week later, E.A. was interviewed at a child advocacy center.

At trial, E.A. testified that Berger repeatedly sexually assaulted her when she was 4 to 6 years old. Most of the assaults occurred in her bedroom. On each occasion, Berger removed her pants and underwear and either rubbed her vagina with his hand or removed his pants and underwear and touched her vagina with his penis. She recalled one incident in which Berger crawled toward her on his hands and knees, grabbing her arms as she tried to back away, and another incident in which he choked her with one hand as he rubbed her vagina with the other. In addition, E.A. recalled an incident in which DeAnn held her wrists above her head while Berger penetrated her vagina with his fingers.

E.A. also recalled two assaults that occurred in the bathroom. On both occasions, Berger walked in as she was getting out of the shower. When she attempted to cover herself with the shower curtain, Berger pulled it away and told her to bend over the toilet with her face toward the back of the toilet. He

then unzipped his pants, placed his hands on her hips, and inserted his penis into her vagina.

*T.H.'s Disclosure.*

In early 2018, T.H. was having some personal problems and reached out to Amy through social media. T.H. testified that at one point Amy stated that Berger was an "asshole," which T.H. inferred was an acknowledgment that Amy knew Berger had sexually abused her.

In April 2018, T.H. wrote a note to her high school basketball coach which stated in part that she had talked to her birth mother, Amy, who disclosed that she knew Berger had sexually abused her. The coach turned the note over to the school principal.

The school guidance counselor subsequently contacted T.H. and spoke with her about the note. T.H. was resistant to talk at first but eventually disclosed that she had been sexually abused. Specifically, she stated that Berger had separated her from her siblings and touched her genital area.

On June 28, 2020, T.H. was interviewed at a child advocacy center and disclosed that she had been sexually abused. Two months later, she spoke to an Omaha police detective on the phone and disclosed additional details about the abuse.

At trial, T.H. testified that Berger repeatedly sexually assaulted her when Amy lived with Berger and T.H. would come to visit. Most of the assaults occurred in the living room or in Berger's bedroom. Typically, Berger would sit next to her on the couch or lie next to her on the bed, slide his hand inside her pants, and massage her vagina. T.H. recalled one occasion where Berger lay next to her on the bed, pulled down her pants and underwear, and tried to insert his finger into her vagina.

T.H. also recalled an incident that occurred in the garage. T.H. went into the garage where Berger was working on his car. Berger grabbed her arm, placed her face down on the back seat, and pulled down her pants. He then inserted his penis into her anus.

*Other State Evidence.*

Armstrong testified generally about children who have suffered significant trauma, not just sexual abuse, by a caregiver. She testified that children who have suffered a trauma present with a wide range of behaviors and that is why children typically come to her with many different diagnoses. Armstrong stated that a child may struggle with attachment, especially if the trauma was caused by an adult caregiver. Lying, often about trivial things, is one behavior she has seen from traumatized children. She also stated that children sometimes tell "made-up stories" or "tall tales," but not typically in regard to a trauma. Armstrong testified that it is common for children to delay reporting or disclosing trauma because they often do not trust adults. In her experience, it is not uncommon to see a delay of years before a child opens up about a trauma. She also stated that children often will talk about sexual abuse when they reach their teenage years because puberty often triggers memories.

The director of children's services at a child advocacy center also testified. Like Armstrong, she explained why children often do not disclose abuse right away. She also testified that disclosure is a process, not an event, and that children may have difficulty recalling individual incidents when the abuse occurred repeatedly over an extended period.

*Berger's Evidence.*

Berger testified in his own defense and generally denied the allegations. He also called two witnesses to corroborate portions of his testimony. All three specifically testified, contrary to T.H.'s testimony, that Berger never parked his car in the garage because there was no room to park it there. It was always parked in the driveway.

*Outcome.*

The case was submitted to the jury, and it returned guilty verdicts on all three counts. The court accepted the jury verdicts and adjudged Berger guilty of the offenses.

The court subsequently sentenced Berger to 20 to 30 years' imprisonment on count 1 (first degree sexual assault of a child), 20 to 30 years' imprisonment on count 2 (first degree sexual assault of a child), and 3 to 3 years' imprisonment on count 3 (third degree sexual assault of a child). It ordered the sentences on counts 1 and 2 to run consecutively to one another and the sentence on count 3 to run concurrently.

## ASSIGNMENTS OF ERROR

Berger assigns that the trial court erred in (1) not releasing the victims' medical and therapy records to his expert witness, (2) ruling prior to trial that his expert witness' testimony was inadmissible, and (3) not allowing his expert witness to provide rebuttal testimony.

## STANDARD OF REVIEW

[1,2] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Said, supra.*

[3-5] A trial court exercises its discretion in determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value. *Id.* An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.* A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion. *Id.*

[6] An appellate court reviews a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion. *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016).

## ANALYSIS

*Refusal to Release Medical and*
*Therapy Records to Davis.*

Berger first assigns that the district court erred in failing to release the victims' medical and therapy records to Davis, Berger's expert. He claims that such denial violated the Sixth Amendment Confrontation Clause and Compulsory Process Clause. He argues that by not allowing his expert access to this "potentially exculpatory treasure trove," the court denied him the ability to adequately present a defense. Brief for appellant at 37. He contends that releasing the in camera medical and therapy records to Davis was a precursor to Davis' being able to articulate the exact psychological and mental health issues the victims were suffering.

The Nebraska Supreme Court set forth the procedure for obtaining privileged medical records in *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989). The procedure is derived from *State v. Esposito*, 192 Conn. 166, 471 A.2d 949 (1984). In *Esposito*, the Connecticut Supreme Court detailed the process to be used for review of a witness' privileged records. It explained:

If, however, the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. *If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does*

*not disclose relevant material then the resealed record is*
*to be made available for inspection on appellate review.*
If the in camera inspection does reveal relevant material
then the witness should be given an opportunity to decide
whether to consent to release of such material to the
defendant or to face having [the] testimony stricken in the
event of refusal.

*Id.* at 179-80, 471 A.2d at 956 (emphasis supplied). In adopt-
ing the Connecticut Supreme Court's procedure, the Nebraska
Supreme Court omitted the italicized language, using ellipses,
presumably because the issue presented involved the initial
procedure of producing the records, not what should occur if
some or all of the records were withheld. See S*tate v. Santos-*
*Romero*, 31 Neb. App. 14, 974 N.W.2d 624 (2022).

We first focus on E.A.'s therapy records created by
Armstrong and Schweitzer, E.A.'s therapists from ATC. The
trial court completed its in camera review of these records and
denied Berger's motion to compel production of the records,
finding that the records did not contain relevant material. The
court later received the records as exhibit 1 and ordered that it
be sealed.

We have reviewed exhibit 1 and agree with the trial court
that it does not include relevant information. The only diagno-
sis in exhibit 1 is PTSD. Based on Davis' report, he was aware
from other sources he reviewed that E.A. had been diagnosed
with PTSD. As will be further discussed later in this opinion,
when Davis testified at the motion in limine hearing, he did
not state that PTSD can affect one's truthfulness or credibility.
He was asked which of E.A.'s diagnoses could be attributed to
a person's being less likely to give truthful testimony, and he
stated only borderline personality disorder, oppositional defiant
disorder, or conduct disorder. Therefore, without any informa-
tion in exhibit 1 about these three diagnoses, the exhibit was
not relevant to the issue of E.A.'s credibility. Accordingly, we
conclude that the trial court did not err in refusing to release
E.A.'s therapy records from ATC to Davis.

The other records that Berger claims the court erred in refusing to release are those Berger subpoenaed on March 2, 2020, including T.H.'s therapy and medical records from Tapley, Arias, and Bryan Hospital, and E.A.'s therapy and medical records from Anderson, Conaway, and Boys Town Residential Center. Berger questions whether the trial court received all of the medical records it was supposed to receive and whether an in camera review was conducted. He asks us to review the in camera sealed records to determine if the court reviewed all the records that were subpoenaed to the court's chambers.

[7,8] The records Berger subpoenaed on March 2, 2020, are not part of the appellate record before us. None of these requested records were received into evidence and sealed as the ATC records were. Accordingly, the record does not reveal whether the trial court received the records or whether an in camera review was conducted. There is nothing for us to review. The procedure set forth in *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989), does not address, and therefore does not prevent, a defendant's request that the records reviewed be sealed and included as part of an appellate record. See *State v. Santos-Romero, supra*. In fact, *State v. Esposito*, 192 Conn. 166, 471 A.2d 949 (1984), on which the *Trammell* procedure was derived, anticipates such action. It is incumbent upon an appellant to supply a record which supports his or her appeal. *State v. Boche*, 294 Neb. 912, 885 N.W.2d 523 (2016). Absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed. *Id.* Berger has failed to provide us with a record that supports his argument on appeal.

We conclude that Berger's first assignment of error fails.

*Pretrial Ruling to Exclude*
*Davis' Testimony.*

Again relying on the Sixth Amendment Confrontation Clause and Compulsory Process Clause, Berger next assigns that the trial court erred in ruling prior to trial that Davis'

testimony was inadmissible. Berger's assignment of error is based on the court's granting the State's motion in limine to prevent Berger from adducing any expert witness testimony at trial regarding the credibility or reliability of the victims' accusations. Berger argues that the court had no evidence to conclude that Davis' testimony would confuse or negatively affect the jurors. He also contends that he laid the foundation and legal reasoning as to why Davis should have been allowed to testify.

[9] Evidence which is not relevant is not admissible. Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2016). And, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020).

Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), governs the admissibility of expert testimony and provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[10] When a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, in accordance with rule 702, whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Kirkwood v. State*, 16 Neb. App. 459, 748 N.W.2d 83 (2008).

At the hearing on the State's motion in limine to prevent Davis from testifying, Berger offered four exhibits into

evidence, including Davis' report. In his report, Davis listed the various materials that he reviewed, summarized the pertinent portions, and listed the psychiatric diagnoses that each victim had been given at some point in the past. Davis opined that both victims had numerous psychiatric diagnoses and symptoms that "significantly affect [their] perception, memory, cognition, and behavior related to the alleged sexual assaults and other events in [their lives]." In addition, he noted that their mother had been diagnosed with bipolar disorder and schizoaffective disorder, both of which have strong genetic elements and increased the likelihood that E.A. and T.H. also have those disorders, and "there is an increased likelihood that the impact that those disorders have on perception, memory, cognition, and behavior are also affecting E.A. and T.H."

Davis also testified at the hearing on the State's motion in limine. He explained that he had been retained to

> provide some general information about children and memory and the effect that various factors, such as suggestibility types of questioning, those types of things can have on children, as well as the impact that mental illness and [the victims'] specific conditions can have on memory and overall personal and cognitive functioning.

Davis acknowledged that he had not evaluated E.A. or T.H. and that while he found the sheer number of their diagnoses indicated severe mental illness, he could not determine whether the individual diagnoses were accurate. He noted that "[t]he providers have had apparently some difficulty in sorting out exactly what the definitive diagnosis is when you're given this many diagnoses." He also stated:

> That's one of the difficulties in this case is looking at all of these different diagnoses that have been given and the various symptoms that these young ladies have had is trying to put together a definitive diagnosis so you know exactly what to treat with exactly what medication or therapy.

Davis reviewed the diagnostic criteria for every disorder listed and explained how each one could potentially affect the victims' perception, memory, and cognition. He also testified that with the exception of bipolar disorder, all of the victims' diagnoses could have been caused by childhood abuse or trauma. He also testified that bipolar disorder is not typically diagnosed in children and can be confused with several other disorders, and individuals under age 18 cannot be validly diagnosed with personality disorders.

At one point, the court asked Davis whether any of the victims' diagnoses were specific to their credibility in terms of truthfulness. Davis responded that a person with borderline personality disorder, oppositional defiant disorder, or conduct disorder is "probably less likely to give truthful testimony or make truthful statements than someone who does not have those kinds of conditions."

The district court expressed concern about the danger of a juror hearing that a person with one of these diagnoses could be untruthful and jumping to the conclusion that this person is untruthful. The court also questioned the value of sharing a diagnosis with the jury and wondered why the jury could not make a credibility determination on all of the other factors without necessarily knowing that the victim might have a mental diagnosis. The court also confirmed that Davis would need a "valid diagnosis" before he could testify about its effects on the victims' cognitive function, which he did not have at that time. Davis agreed with the court, stating "And I think you're 100 percent correct that with all of these diagnoses, people are seeing certain aspects of something and maybe one or two of those are valid, but we just don't know at this point." The court acknowledged that some of the diagnoses could be relevant, but stated, it did not have "enough of a factual, underlying foundational basis" to admit them.

[11] For admissibility of an expert's testimony pursuant to rule 702, a trial court must first determine whether the witness is qualified to provide an expert opinion. In this case, the

State was not challenging Davis' qualifications as an expert or his methodology. Rather, it was challenging the relevance of his testimony and arguing that it would invade the province of the jury. Accordingly, the trial court was asked only to determine whether Davis' opinion would assist the trier of fact. See *State v. Case*, 4 Neb. App. 885, 553 N.W.2d 173 (1996). This determination initially requires a determination of relevance. *Id.*

[12-14] Most trial court rulings excluding expert testimony can be explained as findings by the court that the issue is inappropriate for expert resolution, either because the expert is not needed for the jury to resolve the issue or because the expert is incapable of rendering meaningful assistance. *Id.* The trial court's determination of whether an expert's testimony will be helpful to the jury or assist the trier of fact in accordance with rule 702 is a determination involving the discretion of the trial court, whose ruling on the admissibility of an expert's testimony or opinion will be upheld on appeal unless the trial court abused its discretion. *State v. Case, supra*. It has been further held that when an expert's opinion on a disputed issue is merely a conclusion which may be deduced equally well by the trier of fact with sufficient evidence on the issue, the expert's opinion is superfluous and does not assist the trier of fact in determining the factual issue or understanding the evidence. See *id.*

The trial court found that Davis' opinion would not assist the trier of fact and that its probative value was substantially outweighed by the danger of unfair prejudice. Berger sought to have Davis testify that the victims' mental diagnoses affected their behavior, their memory, and their ability to tell the truth or, in other words, their credibility. The trial court was rightfully concerned about the validity of the victims' diagnoses and the danger that a jury would jump to a conclusion about the victims' mentality and credibility. The court recognized that some of the diagnoses could be relevant, but concluded it did not have sufficient foundational basis to

admit the evidence. Berger was able to test the victims' credibility in other ways without creating the risk that the jury would rely too heavily on the victims' diagnoses and jump to conclusions.

[15] It is within the trial court's discretion to determine whether there is sufficient foundation for an expert witness to give his or her opinion about an issue in question. *In re Interest of A.M.*, 281 Neb. 482, 797 N.W.2d 233 (2011). We conclude that the trial court did not abuse its discretion in excluding Davis' testimony.

*Refusal to Allow Rebuttal*
*Testimony by Davis.*

Berger assigns that the trial court erred in not allowing Davis to provide rebuttal testimony. He argues that "[a]s the State presented its case and arguably opened the door to Dr. Davis' testimony, . . . the defense should have been allowed to offer Dr. Davis' testimony to explain the inconsistencies, memory lapses, and . . . lying behaviors" of the victims. Brief for appellant at 40. Berger does not explain what testimony the State elicited that allegedly "opened the door." Given the absence of a specific argument on this issue, we do not address it further.

Berger also argues that the court's reasoning for excluding Davis' testimony following the State's case was flawed and not supported by the evidence. Berger asked the court to reconsider the admissibility of E.A.'s mental health diagnoses and made an offer of proof by calling Armstrong to testify. Armstrong testified that when she began treating E.A. in 2011, E.A. had been diagnosed with PTSD, reactive attachment disorder, attention deficit hyperactivity disorder, and adjustment disorder. She testified that E.A.'s diagnoses fit her presentation at the time she started treating her and continued to fit throughout treatment.

Armstrong testified that reactive attachment disorder can affect the ability to be truthful. She stated that none of E.A.'s

diagnoses cause psychotic symptoms, but reactive attachment disorder can cause a person to look psychotic. She explained that young children are typically not diagnosed with psychosis. Armstrong testified that PTSD and reactive attachment disorder can cause delusional thinking but that it is difficult to talk about children and delusions because children in general can be delusional. She also testified that PTSD can cause flashbacks of past trauma, rather than hallucinations. Armstrong further stated that therapists only consider psychological evaluations/diagnoses from the past 3 years and that E.A.'s diagnoses were "pretty old."

Berger also offered a transcript of the February 2021 motion in limine hearing where Davis testified, and Berger stated that if Davis was called to testify, his testimony would be substantially similar to his previous testimony. The court stated that it was not changing its ruling in regard to allowing Davis to testify. Specifically, the court stated:

> And the motion — the same ruling stands. Again, two things arose which I thought were interesting. One, particularly that last thing, [Armstrong] says that generally you only rely upon those diagnoses for a period of three years and they were quite a long time ago; and, number two, that we were still couching things in possibly and speculative and, therefore, I think it's not relevant and would be 403. . . . But you got your record, so — all right.

Berger takes issue with the court's reliance on Armstrong's statement that therapists generally only rely on psychological diagnoses for a period of 3 years and E.A.'s diagnoses were "quite a long time ago."

Berger contends there was evidence that E.A. was diagnosed with reactive attachment disorder and PTSD within 3 years prior to her sexual assault accusations and that T.H. was diagnosed with PTSD within 3 years. Regardless of how recent the victims' diagnoses of reactive attachment disorder and/or PTSD were, these were not diagnoses that Davis testified could affect credibility. If allowed to testify at trial, his testimony

would have been that borderline personality disorder, oppositional defiant disorder, and conduct disorder can cause a person to be less likely give truthful testimony. Accordingly, Armstrong's offer of proof did not support allowing Davis to testify in regard to the victims' credibility.

The court also noted that the diagnoses were still uncertain and speculative. The court had the same concerns about Davis' testimony that it did when it granted the motion in limine. It was still concerned that Davis' testimony would not assist the jury and would be more prejudicial than probative. Berger's final assignment of error fails.

## CONCLUSION

Having found that each of Berger's assignments of error fail, we affirm his convictions and sentences.

AFFIRMED.